IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| REHABCARE GROUP EAST, INC. d/b/a | ) | |
| REHABCARE GROUP THERAPY | ) | |
| SERVICES, INC.; and | ) | |
| | ) | |
| PHARMACY CORPORATION | ) | |
| OF AMERICA, AS ASSIGNEE OF | ) | |
| PHARMERICA CORPORATION, | ) | |
| | ) | |
| PLAINTIFFS, | ) | CASE NO. 4:14-cv-886-FJG |
| | ) | |
| v. | ) | |
| | ) | |
| STRATFORD MO/KAN DEVELOPMENT | ) | |
| CORPORATION; | ) | |
| | ) | |
| Serve: Kenneth R. Blom | ) | |
| 9600 E. 53rd Street | ) | |
| Raytown, Missouri 64133 | ) | |
| | ) | |
| STRATFORD HEALTH CARE | ) | |
| PROPERTIES, LLC; | ) | |
| | ) | |
| Serve: Kenneth R. Blom | ) | |
| 9600 E. 53rd Street | ) | |
| Raytown, MO 64133 | ) | |
| | ) | |
| | ) | |
| STRATFORD HEALTH CARE GROUP, INC. | ) | |
| | ) | |
| Serve: Kenneth R. Blom | ) | |
| 9600 E. 53rd Street | ) | |
| Raytown, MO 64133 | ) | |
| | ) | |
| FIT FOR LIFE, INC.; | ) | |
| | ) | |
| Serve: Kenneth R. Blom | ) | |
| 9600 E. 53rd Street | ) | |
| Raytown, MO 64133 | ) | |
| | ) | |
| FITNESS FOR LIFE, L.C.; | ) | |
| | ) | |
| Serve: Kenneth R. Blom | ) | |
| 9600 E. 53rd Street | ) | |
| Raytown, MO 64133 | ) | |

```
STRATFORD SPECIALTY CARE, INC.;          )
                                         )
                                         )
    Serve:  Kenneth R. Blom              )
            9600 E. 53rd Street          )
            Raytown, MO 64133            )
                                         )
KENNETH BLOM;                            )
9600 E. 53rd Street                      )
Raytown, MO 64133                        )
                                         )
RANDALL WILLBANKS;                       )
9600 E. 53rd Street                      )
Raytown, MO 64133                        )
                                         )
THAD BATSON; and                         )
4505 Madison Ave.                        )
Kansas City, MO 64111                    )
                                         )
JOHN DOES 1-10                           )
                                         )
        DEFENDANTS.                      )
```

## AMENDED COMPLAINT

Plaintiffs RehabCare Group East, Inc. d/b/a Rehab Group Therapy Services, Inc. ("RehabCare") and Pharmacy Corporation of America, as Assignee of PharMerica Corporation ("PharMerica") (collectively RehabCare and PharMerica are the "Plaintiffs"), state as follows for their Amended Complaint against Defendants (1) Stratford Mo/Kan Development Corporation ("Stratford Management"), (2) Stratford Health Care Properties, LLC ("Stratford Properties"), (3) Stratford Health Care Group, Inc. ("Stratford Operator"); (4) Fit for Life, Inc. ("Fit for Life"), (5) Fitness for Life, L.C. ("Fitness for Life"), (6) Stratford Specialty Care, Inc. ("Seasons Care"), (7) Kenneth Blom ("Blom"), (8) Randall Willbanks ("Willbanks"), (9) Thad Batson ("Batson"), and (10) John Does 1-10 (collectively the "Defendants"):

1.     This action arises out of Defendants' scheme to defraud Stratford Operator's judgment creditors, including Plaintiffs RehabCare and PharMerica, by transferring and fraudulently conveying all of Stratford Operator's assets to make it judgment proof before Plaintiffs were able to obtain judgments and collect against Stratford Operator.

2.     Once Stratford Operator was insolvent and going out of business, Stratford Operator's officers and directors, Defendants Blom and Willbanks, owed fiduciary duties to Stratford Operator's creditors to hold the company's assets in trust for the benefit of all creditors. Yet, Blom and Willbanks breached this duty by siphoning money and assets away from Stratford Operator to Stratford Management, Stratford Properties, Fit for Life, and Seasons Care, without a legitimate business purpose, making preferential transfers to other creditors, and, eventually, by selling all of Stratford Operator's assets without receiving any consideration in return. Instead, and as described below, the consideration for the sale of the operations of the skilled nursing facility operated by Stratford Operator was placed in the sale of the real estate.

3.     Blom and Willbanks, with the assistance of attorney-Defendant Thad Batson, structured the sale of Stratford Operator's operations of a skilled nursing facility so that all of the consideration was paid to Defendant Stratford Properties, in an attempt to keep the money out of the reach of Stratford Operator's creditors. The funds and assets should have been paid to Stratford Operator and made available to pay its creditors, including Plaintiffs.

4.     Although legally distinct entities, Stratford Operator, Stratford Properties, Fit for Life, Fitness for Life, and Seasons Care ("Stratford Subsidiaries") are the alter egos of Stratford Management, and the ultimate owners, Blom and Willbanks (the Stratford Subsidiaries and Stratford Management are collectively the "Stratford Entities"). During all or part of the relevant period, Blom and Willbanks were shareholders of Stratford Management, who, in turn, was the sole

3

shareholder or member of each of the Stratford Subsidiaries. Through Stratford Management, and in their roles as the executive officers or directors of each member of the Stratford Entities, Blom and Willbanks ran each of the Stratford Entities as a single organization and commingled funds and liabilities. In doing so, Blom and Willbanks were able to defraud creditors of the Stratford Subsidiaries, including Stratford Operator, by transferring assets and money from the indebted subsidiaries to others Stratford Entities, ostensibly keeping the assets out of the reach of creditors. For this reason, all of the Stratford Entities, Blom, and Willbanks should be jointly and severally liable for the torts committed by Stratford Operator, Stratford Management, Stratford Properties, Seasons Care, Blom and Willbanks.

## THE PARTIES

5.     RehabCare is a Delaware corporation with its principal place of business in Louisville, Kentucky. RehabCare provides therapy services to residents of long term care and skilled nursing facilities.

6.     PharMerica is a California corporation with its principal place of business in Louisville, Kentucky. PharMerica provides pharmacy-related goods and services to residents of long term care and skilled nursing home facilities.

7.     Stratford Management is a Missouri corporation with its principal place of business at 9600 E. 53rd Street, Raytown, Missouri. It is presently owned by Willbanks, and was formerly owned by Willbanks, Blom and non-party Sheila Wade. Blom and Willbanks are the sole members of the company's Board of Directors. Blom serves as the company's president, and Willbanks serves as the secretary and treasurer.

8.     Stratford Properties is a Missouri limited liability company with its principal place of business at 9600 E. 53rd Street, Raytown, Missouri. It is a wholly-owned subsidiary of Stratford Management, and as a limited liability company, it takes the corporate citizenship of its

4

parent/member for diversity jurisdiction. Therefore, Stratford Properties is deemed a citizen of Missouri. Stratford Properties formerly owned the real property improved with a skilled nursing facility, known as Hidden Lake Care Center, located at 11400 Hidden Lake Drive, Kansas City, Missouri 64133 (the "Real Property"). Blom serves as the company's president, and Willbanks serves as the secretary and treasurer.

9.     Stratford Operator is a Missouri Corporation with its principal place of business at 9600 E. 53rd Street, Raytown, Missouri. It is a wholly-owned subsidiary of Stratford Management. Blom serves as the company's president, and Willbanks serves as the secretary and treasurer. Stratford Operator owned and operated the Hidden Lake Care Center (the "Facility") until operations of the Facility were transferred to Hidden Lake Management, LLC. Stratford Operator owned Real Property for the Facility until June 2011, when it conveyed the Real Property to Stratford Properties and began paying rent to Stratford Properties. Plaintiffs provided therapy-related and pharmacy-related goods and services to Stratford Operator's residents pursuant to a therapy services agreement and pharmacy services agreement. Stratford Operator failed to pay for the services provided by Plaintiffs at the Facility, which resulted in lawsuits and judgments, which are the subject of this litigation.

10.     Fit for Life is a Missouri corporation with its principal place of business at 9600 E. 53rd Street, Raytown, Missouri. It is a wholly-owned subsidiary of Stratford Management. Blom and Willbanks are the sole members of the company's Board of Directors. Blom serves as the company's president, and Willbanks serves as the secretary and treasurer.

11.     Fitness for Life is a Missouri limited liability company with its principal place of business in Raytown, Missouri. It is a wholly-owned subsidiary of Stratford Management, and as a limited liability company, it takes the corporate citizenship of its parent/member for diversity

jurisdiction. Therefore, Stratford Properties is deemed a citizen of Missouri. Blom serves as the company's president, and Willbanks serves as the secretary and treasurer.

12. Seasons Care is a Missouri corporation with its principal place of business at 9600 E. 53rd Street, Raytown, Missouri. It is a wholly-owned subsidiary of Stratford Management. Blom and Willbanks are the sole members of the company's Board of Directors. Blom serves as the company's president, and Willbanks serves as the secretary and treasurer.

13. Kenneth Blom is a citizen of Independence, Missouri. He was a shareholder of Stratford Management until December 31, 2011, and presently serves as the president of each of the Stratford Entities, and as a board member of each corporation within the Stratford Entities.

14. Randall Willbanks is a citizen of Leawood, Kansas. He is presently the sole shareholder of Stratford Management, serves as the secretary and treasurer of each of the entities within the Stratford Entities, and serves as a board member of each corporation within the Stratford Entities.

15. Thad Batson is a resident of Bucyrus, Kansas. At all times relevant to this Complaint, Batson was licensed to practice law in the State of Missouri. He represented Stratford Operator and Stratford Properties in their sale and transfer of the operations of the Facility and the Real Property to Hidden Lake Management, LLC and Hidden Lake Realty, LLC.

16. Plaintiffs do not presently know the true names and capacities of Does 1 through 10 inclusive, and for that reasons sues these defendants under such fictitious names. Upon information and belief, each of the fictitiously named defendants is in some manner responsible for the events alleged herein. When Plaintiffs ascertain the true names and capacities of Does 1 through 10 inclusive, they will amend this complaint accordingly.

17.     Hidden Lake Realty, LLC ("New Landlord") is an Ohio limited liability company with its principal place of business in St. Louis, Missouri.  New Landlord purchased the Real Property from Stratford Properties in an Asset Purchase Agreement dated March 22, 2012.

18.     Hidden Lake Management, LLC ("New Operator") is a Missouri limited liability company with its principal place of business in St. Louis, Missouri.  Stratford Operator transferred operations of the Facility to New Operator in an Operations Transfer Agreement dated August 15, 2012.  New Operator now operates the Facility and leases the Real Property from New Landlord.

19.     Sheila Wade is a citizen of Overland Park, Kansas.  Until December 31, 2011, she was a shareholder of Stratford Management, when she sold all of her shares in the corporation to her brother, Randall Willbanks.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and, as set forth below, the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     The Court has personal jurisdiction over Defendants because their principal places of business are in Missouri and the relevant events occurred in Missouri.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants do business in this judicial district and because a substantial part of the events or omissions giving rise to this action occurred within this judicial district.

## STATEMENT OF FACTS

**A.     The Stratford Entities.**

23.     Although technically legally distinct entities in that they are registered with the applicable Secretary of State as such, each of the Stratford Entities is ultimately controlled by the

7

same people, sharing similar boards of directors and executive officers. Blom serves as President and Willbanks serves as Secretary and Treasurer of all the Stratford Entities.

24. The Stratford Entities share the same principal place of business at 9600 E. 53rd Street, Raytown, Missouri.

25. The Stratford Entities share the same financial interest because they are each ultimately owned by Willbanks and were formerly each owned by Willbanks, Blom, and Sheila Wade.

26. In order to protect their financial interests, Blom and Willbanks structured the Stratford Entities such that the three shareholders owned Stratford Management, which, in turn, was the sole shareholder or member of each of the Stratford Subsidiaries. Blom and Willbanks used the Stratford Subsidiaries to incur the liabilities of their operations, and meanwhile passed the profits from the Stratford Subsidiaries up to Stratford Management to ostensibly keep the assets away from Stratford Subsidiaries' creditors. The profits from the Stratford Subsidiaries were ultimately paid to Blom and Willbanks.

27. Although each of the Stratford Entities maintained separate bank accounts, money was transferred freely between them and commingled often.

28. The Stratford Entities each borrowed money from Valley View State Bank in Overland Park, Kansas. To secure those loans, the Stratford Entities offered assets held by other Stratford Entities as collateral. They each pay their loans by transferring money to Stratford Management who, in turn, makes a single monthly payment to Valley View State Bank.

**B.** **Stratford Operator's contracts with Plaintiffs.**

29. On or about September 10, 2003, Stratford Operator entered into a Therapy Services Agreement with RehabCare, whereby RehabCare agreed to provide therapy services to Stratford

Operator's patients at the Facility and Stratford Operator, in turn, agreed to pay RehabCare for services rendered.

30.     On or about September 29, 2008, Stratford Operator entered into a Pharmacy Services Agreement with PharMerica, whereby PharMerica agreed to provide pharmacy-related goods and services to Stratford Operator's patients at the Facility and Stratford Operator, in turn, agreed to pay PharMerica for services rendered.

31.     Beginning in 2010, Stratford Operator stopped paying its monthly bills to PharMerica as they became due, thereby breaching its obligations under the Pharmacy Services Agreement.  Specifically, Stratford Operator failed to pay its monthly bills to PharMerica in the amounts of $13,247.39 in May 2010, $19,085.88 in July 2010, $15,109.40 in September 2010, and $26,738.26 in October 2010.

**C.     Blom, Willbanks, and John Does 1-10's Fraudulent Scheme, Part 1:  Transfer Stratford Operator's most valuable asset to the related real estate holding company, Stratford Properties.**

32.     Knowing that Stratford Operator was not paying its bills beginning in 2010, Blom, Willbanks, and John Does 1-10 developed a scheme to put Stratford Operator's assets ostensibly outside the reach of Stratford Operator's creditors – including Plaintiffs.

33.     Until June 2011, Stratford Operator's most valuable asset was the Real Property that was improved by the skilled nursing facility located at 11400 Hidden Lake Drive, Kansas City, Missouri 64133, which Stratford Operator owned jointly with Stratford Management.

34.     Blom, Willbanks, and John Does 1-10 knew that, if Stratford Operator continued to default on its debt obligations, Stratford Operator's creditors could seek to place a lien on the Real Property and would ultimately foreclose on the Real Property.  This posed a substantial threat to Blom's and Willbanks' own financial interests because they were the ultimate owners of the Real Property through their ownership of Stratford Management and Stratford Operator.

9

35.    In order to protect Blom's and Willbanks' financial interests, Blom, Willbanks, and John Does 1-10, on behalf of themselves and the Stratford Entities, developed the plan to convey title of the Real Property to Stratford Properties, a real estate holding company that Blom and Willbanks owned and controlled.  By conveying the property to a holding company that they ultimately owned and controlled, Blom and Willbanks, with the aid of John Does 1-10, ensured that one of Stratford Operator's most valuable assets would be ostensibly outside the reach of its creditors.

36.    On or about June 2, 2011, Blom, on behalf of Stratford Management and Stratford Operator, executed a warranty deed conveying the Real Property to Stratford Properties.  *See* Exhibit A, Warranty Deed.

37.    Although the property was valued at $2,128,000.00 in 2011, Stratford Management and Stratford Operator conveyed the Real Property to Stratford Properties for $10.00.  *See* Exhibit B, Property Account Summary; *See* Warranty Deed.  In structuring the transaction so that Stratford Operator received de minimis consideration, Blom, Willbanks, and John Does 1-10 left Stratford Operator undercapitalized and unable to pay its debts as they became due.

38.    At the time Stratford Management and Stratford Operator transferred the property to Stratford Properties, Stratford Operator owed a substantial sum of money to its creditors, including Plaintiffs.

**D.    Stratford Operator Allows Amounts Owed to Plaintiffs to Increase.**

39.    Once the Real Property had been conveyed from Stratford Operator to Stratford Properties, and thereby placed ostensibly outside the reach of Stratford Operator's creditors, Stratford Operator stopped paying its monthly bills to both PharMerica and RehabCare.

40.    Specifically, Stratford Operator failed to pay monthly bills to RehabCare in the amounts of $67,121.31 in December 2011, $62,736.63 in January 2012, $73,761.34 in February 2012,

$69,516.90 in March 2012, $75,153.65 in April 2012, $75,440.01 in May 2012, $47,696.08 in June 2012, $46,512.66 in July 2012, and $51,394.34 in August 2012.

41.     Similarly, in June 2012, Stratford Operator again failed to pay its monthly invoices to PharMerica.  Specifically, Stratford Operator failed to pay its monthly bills to PharMerica in the amounts of $16,403.07 in June 2012, $22,456.21 in July 2012, and $22,434.24 in August 2012.

42.     By early 2012, Blom, Willbanks, John Does 1-10, and the Stratford Entities knew or should have known that Stratford Operator was insolvent and unable to pay its debts.

**E.     Blom, Willbanks, and John Does 1-10's Fraudulent Scheme, Part 2:  Sell Stratford Operator's operations of the Facility to a third party for no consideration.**

43.     In early 2012, Blom, Willbanks, and John Does 1-10 decided to sell both the operations of the Facility and the Real Property to two related party purchasers.  But Blom, Willbanks, and John Does 1-10 faced a problem:  if they sold the operations of the Facility, Stratford Operator would receive proceeds from the sale that could be collected by Stratford Operator's creditors – like Plaintiffs.

44.     Rather than risk the proceeds from the sale being paid to Stratford Operator, Blom, Willbanks, and John Does 1-10, on behalf of themselves and the Stratford Entities, structured the sale of the operations of the Facility and the sale of the Real Estate so that all proceeds would be paid to Stratford Properties for the Real Estate, and none of the proceeds paid to Stratford Operator for the operations of the Facility.  This left Stratford Operator insolvent and judgment proof against potential forthcoming collections actions brought by Plaintiffs.

45.     Blom, Willbanks, and John Does 1-10 designed the transaction in this way with the help of their attorney, Thad Batson, who has been licensed to practice law in the State of Missouri since 1981.

11

46.     Batson knew or should have known that Stratford Operator was insolvent and that Blom, Willbanks, and John Does 1-10 were concerned that Stratford Operator would soon face collections' actions brought by Stratford Operator's creditors, including Plaintiffs.  Batson, as counsel for Blom, Willbanks, John Does 1-10 and the Stratford Entities, structured the transfer in this manner in order to keep the proceeds from the sale of the Facility's operations ostensibly outside the reach of Stratford Operator's creditors.

47.     Because of his profession as an attorney, Batson knew or should have known that Blom and Willbanks, as officers and directors of an insolvent corporation that was going out of business, owed a fiduciary duty to Stratford Operator's creditors to hold the corporation's assets in trust for the benefit of all creditors.

48.     Nonetheless, Batson represented Blom, Willbanks, John Does 1-10, Stratford Operator and Stratford Properties in the transaction and structured it in such a way that it left Stratford Operator without assets and judgment-proof.

49.     In March 2012, Stratford Properties entered an Asset Purchase Agreement with New Landlord, whereby Stratford Properties agreed to sell the Real Property.  *See* Exhibit C, Asset Purchase Agreement ("APA").  Batson negotiated, reviewed, and drafted the terms of the APA with the purpose of assisting Blom, Willbanks, and the Stratford Entities in rendering Stratford Operator judgment proof.

50.     Pursuant to the terms of the Asset Purchase Agreement, New Landlord purchased the Real Property for $13,500,000.00, plus the amount of a HUD escrow account.  *See* APA § 1.1(a).

51.     The Stratford Entities allocated the $13,500,000.00 sale price as follows:   (1) $750,000.00 for furniture; (2) $7,500,000.00 for the building; (3) $1,820,000.00 for the land; and (4) $3,430,000.00 for goodwill, representing goodwill for the operations of the Facility.  *See* APA Schedule 6.1(n).

12

52.     As purely the owner and landlord of the Real Property, Stratford Properties did not have "goodwill" to sell.  Any "goodwill" in the company was owned by Stratford Operator for the operations of the Facility.

53.     New Landlord bore the bulk of the $13,500,000.00 purchase price, paying $200,000.00 into an escrow account, assuming Stratford Properties' HUD-insured mortgage loan in an amount not to exceed $10,300,000.00 at the closing, and paying the balance of the purchase price in cash or wire transfer.

54.     New Operator also executed and delivered to Stratford Properties a Promissory Note ("Promissory Note") in the amount of $1,000,000.00 as consideration for the sale of the Real Property, which is attached as Exhibit D.  In the Promissory Note, New Operator promised to pay Stratford Properties $1,000,000.00 over a term of three (3) years, with principal payments made at six-month intervals, and at an initial interest rate of 5%, increasing 1% in each subsequent year.  The Promissory Note is secured by personal guarantees of Judah Beninstock, Ben Landa, and Oscar Rosenberg.

55.     In August 2012, Stratford Operator entered into an Operations Transfer Agreement with New Operator to transfer operations of the Facility to New Operator.  *See* Exhibit E, Operations Transfer Agreement ("OTA").  Batson negotiated, reviewed, and drafted the terms of the OTA with the purpose of assisting Blom, Willbanks, and the Stratford Entities in rendering Stratford Operator judgment proof.

56.     Consistent with the OTA, New Operator did not pay Stratford Operator any amount of money as consideration for transfer of the operations of the Facility.

57.     Instead, the value of Stratford Operator's nursing home operations was paid by New Landlord and New Operator to Stratford Properties through the APA.

58.    As of June 2014, operations of the Facility and title to the Real Property have been transferred to New Operator and New Landlord, respectively, and New Landlord has paid Stratford Properties in full pursuant to the terms of the APA, with the exception of ongoing payments under the Promissory Note.[1]

**F.    Blom, Willbanks, and John Does 1-10's Fraudulent Scheme, Part 3: Transfer Stratford Operator's cash to Stratford Management and other Stratford Subsidiaries.**

59.    In January 2012, at the direction of Blom, Willbanks, and John Does 1-10, Stratford Operator began transferring its cash to Stratford Management and other Stratford Subsidiaries.

60.    Specifically, from January 2012 to June 2013, Stratford Operator made 138 transfers from its bank accounts to Stratford Management, totaling approximately $3,991,620.00, as set forth in detail on the chart attached as Exhibit F. Likewise, from January 4, 2012 to November 2013, Stratford Operator endorsed thirty checks to Stratford Management, totaling approximately $1,599,575.71, as set forth in detail on the chart attached as Exhibit G.

61.    A small portion of this money was transferred to Stratford Management so it could pay Valley View State Bank for each of the loans it made to the Stratford Entities. However, Stratford Operator transferred the majority of this money to Stratford Management without any basis for doing so and without receiving anything of value in return, or for any legitimate business purpose, but instead as part of Blom, Willbanks, and John Does 1-10's plan to siphon off Stratford Operator's assets.

62.    From January 23, 2012 to September 21, 2012, Stratford Operator also endorsed seven checks and made six transfers to Fit for Life, totaling $32,975.00, under the guise that these payments were made for services provided by Fit for Life to residents of the Facility.

---

[1] On March 6, 2015, Plaintiffs filed a motion for prejudgment attachment or, in the alternative, motion for preliminary injunction (DN 17), moving the Court to issue a writ of attachment on payments made to Stratford Properties on the Promissory Note or, in the alternative, to issue an injunction preventing Stratford Properties from further transferring payments it receives from New Operator on the Promissory Note.

14

63.     From January 18, 2012 to September 17, 2012, Stratford Operator made twelve transfers to Seasons Care, totaling $79,052.80, with no legitimate business purpose.  *See* Exhibit H.

**G.     Plaintiffs Obtain Default Judgments against Stratford Operator.**

64.     As the Defendants knew or should have known, Plaintiffs filed separate collections actions against Stratford Operator in 2013 based on its failure to pay its past due bills for services rendered at the Facility.

a.     Specifically, RehabCare filed a collections action against Stratford Operator in the Western District of Missouri on April 16, 2013, styled *RehabCare Group East, Inc. v. Stratford Health Care Group, Inc.*, 4:13-cv-373-DW (the "RehabCare Complaint").

b.     PharMerica filed a collections action against Stratford Operator in the Western District of Kentucky on July 12, 2013, styled *Pharmacy Corporation of America, as assignee of PharMerica Corporation v. Stratford Healthcare Group, Inc. d/b/a Hidden Lake Care Center*, 3:13-cv-704-JGH (the "PharMerica Complaint") (collectively, the RehabCare Complaint and the PharMerica Complaint are the "Complaints").

65.     Stratford Operator was properly served with both Complaints, but it failed to answer or otherwise respond to the Complaints within the time allotted by the Federal Rules of Civil Procedure.

66.     Upon information and belief, Stratford Operator chose not to respond to the Complaints because it knew it was nearly judgment proof based on (1) the recent sale of the Facility's operations to New Landlord and New Operator for no consideration, and (2) the transfer of Stratford Operator's cash to Stratford Management and the Stratford Subsidiaries.

67.     Based upon Stratford Operator's failure to respond to the Complaints, Plaintiffs each obtained default judgment against Stratford Operator as follows:

15

a.　　RehabCare was awarded judgment in the following amounts: (1) damages in the principal amount of $568,504.66; (2) pre-judgment interest through July 15, 2013 in the amount of $88,282.21 with a per diem interest in the amount of $218.51 for each day between July 15, 2013 and August 28, 2013, the date judgment was entered; (3) post-judgment interest from August 28, 2013, the date judgment was entered; (4) attorneys' fees in the amount of $6,007.00; and (5) costs in the amount of $553.51.

b.　　PharMerica was awarded judgment in the following amounts: (1) damages in the principal amount of $135,474.45; (2) pre-judgment interest through September 27, 2013 in the amount of $51,636.45 with a per diem interest in the amount of $66.81 for each day thereafter until November 6, 2013, the date judgment was entered; (3) post-judgment interest from November 6, 2013, the date judgment was entered; (4) attorneys' fees in the amount of $7,813.00; and (5) costs in the amount of $470.75.

68.　　To date, Stratford Operator has failed to fulfill its obligations under either judgment.

69.　　Stratford Operator is insolvent and unable to pay either judgment.

### Count I – Fraudulent Conveyance
### (Stratford Properties)

70.　　Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

71.　　By June 1, 2011, Stratford Operator owed substantial sums of money to its creditors, including Plaintiffs.

72.　　In an effort shield its most valuable asset from its creditors, Stratford Operator, through Stratford Management, Blom, Willbanks, and John Does 1-10, transferred the Real Property by warranty deed dated June 2, 2011 to Stratford Properties.

16

73.     Although the Real Property was valued at $2,128,000.00 in 2011, Stratford Management and Stratford Operator conveyed the Real Property to Stratford Properties for $10.00. *See* Exhibit B, Property Account Summary; *See* Warranty Deed.

74.     Stratford Operator and Stratford Properties structured the transfer so that Stratford Operator's most valuable asset would ostensibly be placed outside the reach of Stratford Operator's creditors, including Plaintiffs, while keeping the Real Property under the ultimate ownership of Blom and Willbanks.

75.     Stratford Properties did not pay Stratford Operator the fair market value of the Real Property so that the money would ostensibly be outside the reach of Stratford Operator's creditors, while keeping the money under the ultimate ownership of Blom and Willbanks.  Stratford Properties should have paid Stratford Operator the fair market value for the Real Property so that Stratford Operator, in turn, could pay its creditors, including Plaintiffs.

76.     Stratford Operator was insolvent or became insolvent shortly after it transferred the property to Stratford Properties, as it owed Plaintiffs for goods and services they provided at the Facility and it was not paying its debts as they became due.

77.     Neither Stratford Operator nor Stratford Properties disclosed these transfers to Plaintiffs.

78.     Stratford Operator and Stratford Properties structured these transfers with the actual intent to hinder, delay, and defraud Stratford Operator's creditors, including Plaintiffs, and ultimately to protect Stratford Operator's assets for the benefit of Stratford Management's shareholders, officers and employees, including Blom, Willbanks, and John Does 1-10.

79.     Pursuant to Missouri Revised Code § 428.005 *et seq*, the transfer of the Real Property to Stratford Properties was fraudulent as to Plaintiffs.

80.     Plaintiffs are entitled to all relief set out in Missouri Revised Statute § 428.039.

## Count II – Conspiracy to Engage in Fraudulent Conveyance
### (Blom, Willbanks, John Does 1-10, Stratford Properties)

81.     Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

82.     Through their positions as executive officers and directors of each of the Stratford Entities, Blom and Willbanks knew that as of June 1, 2011 Stratford Operator owed a substantial sum of money to its creditors, including Plaintiffs.

83.     Through their affiliation with the Stratford Entities, John Does 1-10 knew that as of June 1, 2011 Stratford Operator owed a substantial sum of money to its creditors, including Plaintiffs.

84.     With the intent of keeping Stratford Operator's most valuable asset – the Real Property – ostensibly outside the reach of Stratford Operator's creditors, Blom, Willbanks, John Does 1-10 and Stratford Properties agreed to transfer the Real Property to Stratford Properties for de minimis consideration.

85.     On or about June 2, 2011, through Blom's, Willbanks', and John Does 1-10's efforts, Stratford Operator and Stratford Management conveyed by warranty deed the Real Property to Stratford Properties.

86.     As set forth in Count I, the conveyance of the Real Property from Stratford Operator to Stratford Properties was fraudulent as to Plaintiffs.

87.     As a direct and proximate cause of Blom's, Willbanks', John Does 1-10's, and Stratford Properties' agreement and efforts, Stratford Operator was left with virtually no assets and unable to pay its debts to Plaintiffs, who are Stratford Operator's judgment creditors.

88.     Plaintiffs are entitled to all relief set out in Missouri Revised Statute § 428.039 and all other legal and equitable relief that justice so requires.

18

## Count III – Unjust Enrichment
### (Stratford Properties)

89.     In the alternative to Counts I and II, Plaintiffs assert this claim for Unjust Enrichment against Stratford Properties.

90.     Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

91.     Stratford Properties received and retained the benefit of the Real Property, valued at $2,128,000.00 in 2011, from the conveyance of the Real Property from Stratford Management and Stratford Operator to Stratford Properties, in exchange for only $10.00.

92.     Stratford Properties, Stratford Management, and Stratford Operator structured the conveyance of the Real Property to Stratford Properties so that (1) Stratford Properties did not pay the fair market value of the Real Property to Stratford Operator, so that any money proceeds would ostensibly be outside the reach of Stratford Operator's creditors, while keeping the money under the ultimate ownership of Blom and Willbanks and (2) so that Stratford Operator lost one of its most valuable assets for it to pay its debts or for its creditors to satisfy judgments against.  Stratford Properties should have paid Stratford Operator the fair market value for the Real Property so that Stratford Operator, in turn, could pay its creditors, including Plaintiffs.

93.     Stratford Management, Stratford Properties, and Stratford Operator's scheme was intended to, and did, leave Stratford Operator without one of its most valuable assets available to satisfy its debts.

94.     Plaintiffs have provided valuable services to, and received judgments against, Stratford Operator for which they have not been paid.

95.     Plaintiffs' services were rendered under circumstances pursuant to which Stratford Properties and Stratford Operator reasonably should have expected Plaintiffs to be paid.

Case 4:14-cv-00886-FJG   Document 24   Filed 04/29/15   Page 19 of 34

96.     Because Stratford Properties fraudulently structured the transfer of Real Estate for de minimis consideration, and has retained the proceeds of the transfer of the operations, Stratford Properties has been unjustly enriched at the expense of Plaintiffs.

97.     Stratford Properties' retention of the Real Estate without paying due consideration to Stratford Operator, and then ultimately retaining the sale proceeds of the Real Estate without paying due consideration, violates fundamental principles of justice, equity, and good conscience, such that it would not be fair or equitable for Stratford Properties to retain the sale proceeds.

## Count IV – Fraudulent Conveyance
### (Stratford Properties)

98.     Except to the extent inconsistent with this count, Plaintiffs incorporate all of the allegations set forth above.

99.     Stratford Operator was insolvent or became insolvent shortly after it transferred the Facility's operations to New Operator, as it owed Plaintiffs for goods and services they provided at the Facility and was not paying its debts as they became due.

100.    In an effort to keep money out of Stratford Operator's control, thereby shielding it from Stratford Operator's creditors, including Plaintiffs, the Stratford Entities, through the efforts of Blom, Willbanks, John Does 1-10, and Thad Batson, structured the sale of both the Real Property and the Facility's operations such that all proceeds from the sale would be paid to Stratford Properties for the Real Property and none of the proceeds paid to Stratford Operator for the Facility's operations.

101.    New Landlord and New Operator paid Stratford Properties $13,500,000.00 plus the amount of a HUD escrow account ostensibly in exchange for the Real Property, but that sale price also included $3,430,000.00 for goodwill of the operation of the Facility which was not Stratford Properties' asset to sell.

20

102.     Stratford Operator received no monetary compensation for the sale or transfer of its operations to New Operator and therefore did not receive reasonably equivalent value in exchange for the transfer.

103.     Stratford Properties and Stratford Operator transferred all, or substantially all, of their assets.

104.     At the time the Facility and Real Property were sold and transferred, Stratford Properties knew, or should have known, that Stratford Operator was insolvent, and that the proceeds from the sale of Stratford Operator's nursing home operations could have been used to pay Stratford Operator's debts to Plaintiffs.

105.     At the time the Real Property and Facility were sold and transferred, Stratford Properties knew, or should have known, that Stratford Operator would likely face forthcoming lawsuits by creditors, including Plaintiffs, and that the proceeds from the sale of Stratford Operator's nursing home operations could have been used to pay judgments against or debts of Stratford Operator.

106.     As the Stratford Entities, through Blom, Willbanks, and John Does 1-10, had planned, the scheme ultimately enabled the Stratford Entities as a whole to receive a profit from the sale of the Real Property and Facility to the detriment of Stratford Operator's creditors.

107.     As the Stratford Entities had also planned, their scheme kept any proceeds of the sale from going to Stratford Operator, thereby shielding potential proceeds from the reach of Stratford Operator's creditors, including Plaintiffs.

108.     The Stratford Entities, through Blom, Willbanks, John Does 1-10, structured the sale and transfer of the Real Property and the Facility's operations with the actual intent to hinder, delay, or defraud Stratford Operator's creditors, including Plaintiffs.

109. Stratford Properties did not receive proceeds of the transfer of the operations of the Facility in good faith or for reasonably equivalent value.

110. Pursuant to Missouri Revised Code § 428.005 *et seq*, the sale and transfer of the Real Property and operations of the Facility from Stratford Operator and Stratford Properties to New Landlord was fraudulent as to Plaintiffs.

111. Plaintiffs are entitled to all relief set out in Missouri Revised Statute § 428.039.

### Count V – Conspiracy to Engage in Fraudulent Conveyance
### (Stratford Properties, Batson, Blom, Willbanks, and John Does 1-10)

112. Except to the extent inconsistent with this count, Plaintiffs incorporate the allegations set forth above.

113. In or around early 2012, Stratford Properties, Stratford Operator, Blom, Willbanks, and John Does 1-10 retained Thad Batson to represent them in the sale of Stratford Operator's Facility operations and Stratford Properties' Real Property.

114. As counsel for Stratford Properties, Stratford Operator, Blom, Willbanks, and John Does 1-10, Batson knew or should have known that Stratford Operator was indebted to Plaintiffs, and that Stratford Operator planned to continue receiving goods and services from Plaintiffs without paying invoices as they became due.

115. With the intent of keeping money out of Stratford Operator's control, thereby shielding it from Stratford Operator's creditors, including Plaintiffs, Batson structured the sale of both the Real Property and the Facility's operations such that all proceeds from the sale would be paid to Stratford Properties and no proceeds to Stratford Operator.

116. Stratford Properties, Stratford Operator, Blom (individually and as an agent of the Stratford Entities), Willbanks (individually and as an agent of the Stratford Entities), John Does 1-10 and Batson, agreed to structure the transaction in this manner to keep money out of Stratford Operator's control, shielding it from Stratford Operator's creditors.

22

117. Acting upon his agreement with Stratford Properties, Stratford Operator, Blom, Willbanks, and John Does 1-10, Batson reviewed, negotiated, and drafted the terms set forth in the OTA and APA.

118. Pursuant to the terms that Batson reviewed, negotiated and drafted, New Landlord and New Operator paid Stratford Properties $13,500,000.00 plus the amount of a HUD escrow account ostensibly in exchange for the Real Property, but that sale price also included $3,430,000.00 for goodwill of the operation of the Facility which was not Stratford Properties' asset to sell.

119. Also pursuant to the terms that Batson reviewed, negotiated, and drafted, Stratford Operator received no monetary compensation for the sale or transfer of the Facility's operations to New Operator and therefore did not receive reasonably equivalent value in exchange for the transfer.

120. As a direct and proximate cause of Batson's, Stratford Properties', Blom's, Willbanks' and John Does 1-10's agreement and efforts, Stratford Operator was left with virtually no assets and unable to pay its debts to Plaintiffs, who are Stratford Operator's judgment creditors.

121. Plaintiffs are entitled to all relief set out in Missouri Revised Statute § 428.039 and all other legal and equitable relief that justice so requires.

### Count VI – Unjust Enrichment
### (Stratford Properties)

122. In the alternative to Counts IV and V, Plaintiffs assert this claim for Unjust Enrichment against Stratford Properties.

123. Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

124. Stratford Properties has received and retained the benefit of the proceeds from the sale of the operations of the Facility.

23

125.     Stratford Properties and Stratford Operator structured the sale of the Real Property and operations of the Facility such that the consideration for the entire transaction would be paid to Stratford Properties through the sale of the Real Property.

126.     Stratford Properties and Stratford Operator's scheme was intended to, and did, leave Stratford Operator without assets available to satisfy its debts.

127.     Plaintiffs have provided valuable services to, and received judgments against, Stratford Operator for which they have not been paid.

128.     Plaintiffs' services were rendered under circumstances pursuant to which Stratford Properties and Stratford Operator reasonably should have expected Plaintiffs to be paid.

129.     Because Stratford Properties fraudulently structured the transfer of operations to keep the proceeds from Stratford Operator, and has retained the proceeds of the transfer of the operations, Stratford Properties has been unjustly enriched at the expense of Plaintiffs.

130.     Stratford Properties' retention of the sale proceeds violates fundamental principles of justice, equity, and good conscience, such that it would not be fair or equitable for Stratford Properties to retain the sale proceeds.

## Count VII – Fraudulent Conveyance
### (Stratford Management)

131.     Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

132.     By January 2012, Stratford Operator had stopped paying its debts to Plaintiffs as they became due.

133.     Because Stratford Management was owned and operated by the same people as Stratford Operator, Stratford Management knew or should have known that Stratford Operator would face collections' actions brought by Plaintiffs.

134.   In January 2012, and in an effort to shield Stratford Operator's assets from its creditors, including Plaintiffs, Stratford Operator began routinely transferring money and endorsing checks to Stratford Management.   Specifically, from January 9, 2012 to June 2013, Stratford Operator made 139 transfers from its bank accounts to Stratford Management, totaling approximately $3,991,620.00.   *See* Exhibit F.   Likewise, from January 4, 2012 to November 2013, Stratford Operator endorsed thirty checks to Stratford Management, totaling approximately $1,599,575.71. *See* Exhibit G.

135.   Stratford Operator did not receive anything of value in consideration for these transfers to Stratford Management, nor did Stratford Operator make these transfers for a legitimate business purpose.

136.   Stratford Operator transferred all or substantially all of its cash to Stratford Management.

137.   Stratford Operator was insolvent or became insolvent shortly after it transferred the cash to Stratford Management, as it owed Plaintiffs for goods and services they provided at the Facility and was not paying its debts as they became due.

138.   Neither Stratford Operator nor Stratford Management disclosed these transfers to Plaintiffs.

139.   Stratford Operator and Stratford Management structured these transfers with the actual intent to hinder, delay, and defraud Stratford Operator's creditors, including Plaintiffs, and ultimately to protect Stratford Operator's assets for the benefit of Stratford Management's shareholders, officers and employees, including Blom, Willbanks, and John Does 1-10.

140.   Pursuant to Missouri Revised Code § 428.005 *et seq*, the routine money transfers and checks endorsed to Stratford Management were fraudulent as to Plaintiffs.

141.   Plaintiffs are entitled to all relief set out in Missouri Revised Statute § 428.039.

25

## Count VIII – Fraudulent Conveyance
### (Seasons Care)

142.    Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

143.    Seasons Care owned and operated a skilled nursing facility located at 15600 Woods Chapel Road, Kansas City, Missouri until May 2012.

144.    Stratford Operator did not do business with, or receive goods or services from, Seasons Care.

145.    Because it is owned and operated by the same people as Stratford Operator, namely Blom and Willbanks, Seasons Care knew or should have known that Stratford Operator would soon face collections actions brought by Plaintiffs.

146.    In January 2012, and in an effort to shield Stratford Operator's assets from its creditors, including Plaintiffs, Stratford Operator began routinely transferring money to Seasons Care.  Specifically, from January 18, 2012 to September 17, 2012, Stratford Operator made twelve transfers from its banks accounts to Seasons Care, totaling $79,052.80.  *See* Exhibit H.

147.    Stratford Operator did not receive anything of value in consideration for these transfers to Seasons Care, nor did Stratford Operator make these transfers for a legitimate business purpose.

148.    Stratford Operator transferred all or substantially all of its cash to Seasons Care.

149.    Stratford Operator was insolvent or became insolvent shortly after it transferred the cash to Seasons Care, as it owed Plaintiffs for goods and services they provided at the Facility and was not paying its debts as they became due.

150.    Neither Stratford Operator nor Seasons Care disclosed these transfers to Plaintiffs.

151.    Stratford Operator and Seasons Care structured these transfers with the actual intent to hinder, delay, and defraud Stratford Operator's creditors, including Plaintiffs, and ultimately to

protect Stratford Operator's assets for the benefit of the Seasons Care's shareholders, officers and employees, including Blom, Willbanks, and John Does 1-10.

152.     Pursuant to Missouri Revised Code § 428.005 *et seq*, the routine money transfers to Seasons Care were fraudulent as to Plaintiffs.

153.     Plaintiffs are entitled to all relief set out in Missouri Revised Statute § 428.039.

## Count IX - Breach of Fiduciary Duty
### (Blom and Willbanks)

154.     Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

155.     By January 2012, Stratford Operator was insolvent because it had stopped paying its debts as they became due, and it was going out of business or no longer capable of doing business.

156.     Because Stratford Operator was insolvent and going out of business, Blom and Willbanks, as officers and directors of Stratford Operator, owed a fiduciary duty to Stratford Operator's creditors, including Plaintiffs, to hold the assets of the company for the benefit of all creditors. This duty included the obligation to not make preferential transfers to creditors.

157.     As officers and directors of Stratford Operator, Blom and Willbanks knew or should have known that Stratford Operator was indebted to Plaintiffs and would soon face collections actions brought by Plaintiffs.

158.     Blom and Willbanks breached their fiduciary duties to Stratford Operator's creditors, including Plaintiffs, by causing Stratford Operator to make preferential transfers to certain of Stratford Operator's creditors to the determine of other creditors of Stratford Operator, including Plaintiffs. Although Stratford Operator was consistently failing to pay monthly invoices due to Plaintiffs, Stratford Operator routinely transferred money to Stratford Management to pay its loans from Valley View State Bank. Stratford Operator also consistently paid rents to Stratford Properties, and consistently paid Fit for Life ostensibly for services Fit for Life provided to residents of

27

Stratford Operator's Facility. Stratford Operator routinely made each of these payments while failing to pay its monthly invoices and past-due debts to Plaintiffs.

159. Each of these preferential transfers ultimately benefitted entities within the collective Stratford Entities and its shareholders, officers, directors, and employees, including Blom and Willbanks. Stratford Operator's loan from Valley View State Bank was cross-collateralized with loans Valley View State Bank made to other entities within the Stratford Entities' organization; thus, Stratford Operator did not want to default on its loans and put other assets owned by the Stratford Entities at the risk of being foreclosed upon. Likewise, the payments to Stratford Properties and Fit for Life, ostensibly for debts owed, were for the ultimate benefit of the Stratford Entities' shareholders, officers, directors, and employees, including Blom and Willbanks.

160. Additionally, Blom and Willbanks breached their fiduciary duties owed to Stratford Operator's creditors, including Plaintiffs, by causing Stratford Operator to transfer virtually all of its cash to Stratford Management, leaving Stratford Operator with no assets to pay its creditors, including Plaintiffs.

161. Finally, Blom and Willbanks breached their fiduciary duties to Stratford Operator's creditors, including Plaintiffs, by selling Stratford Operator's operations to New Operator without receiving any consideration from the sale. Blom and Willbanks structured the sale of the operations so that consideration for the operations was paid to Stratford Properties for the benefit of each of the Stratford Entities and its shareholders, officers, directors, and employees.

162. Blom's and Willbanks' actions were done intentionally or negligently.

163. Neither Blom nor Willbanks acted in good faith or in the best interest of Plaintiffs.

164. As a direct and proximate cause of Blom's and Willbanks' actions, Stratford Operator now has no assets and is unable to pay its creditors, including Plaintiffs.

28

165.     Plaintiffs have suffered pecuniary damages as a result of Blom's and Willbanks' actions.

## Count X – Aiding and Abetting Breach of Fiduciary Duty
### (Batson)

166.     Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

167.     As set forth above, Blom and Willbanks owed Plaintiffs a fiduciary duty and breached the same by, among other things, putting all the consideration for the transfer of Stratford Operator's Facility operations into the sale of the Real Estate.

168.     Batson knew or should have known that Stratford Operator was insolvent and indebted to Plaintiffs.

169.     Batson negotiated and drafted or participated in drafting the OTA and APA, and thus provided Blom and Willbanks substantial assistance in effecting their breach of fiduciary duty.

170.     By negotiating and drafting or participating in drafting the OTA and APA, Batson intended to aid Blom and Willbanks in structuring the sale so that all of the proceeds for the operation of the Facility were included in the sale of the Real Property.  Batson, thus, intended to aid Blom and Willbanks in breaching their fiduciary duty to Stratford Operator's creditors, including Plaintiffs.

171.     Plaintiffs have suffered pecuniary damages as a direct and proximate result of Batson's actions.

## Count XI – Piercing the Corporate Veil
### (Blom, Willbanks, Stratford Management, Stratford Properties, Fit for Life, Fitness for Life, and Seasons Care)

172.     Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

Case 4:14-cv-00886-FJG   Document 24   Filed 04/29/15   Page 29 of 34

173.    Blom, Willbanks, Stratford Management, Stratford Properties, Stratford Operator, Fit for Life, Fitness for Life, and Seasons Care are "alter egos" of one another.

174.    Each of the Stratford Entities are controlled by Blom and Willbanks, both directly and through their positions as officers and directors of Stratford Management, and Blom and Willbanks use the corporate cloak of each Stratford Entity as a subterfuge to defeat public convenience, to justify a wrong, and to perpetrate a fraud against Stratford Operator's creditors.

175.    In order to protect their own financial interests, Blom and Willbanks structured the Stratford Entities such that the Blom, Willbanks, and Wade owned Stratford Management which, in turn, was the sole shareholder of each of the Stratford Subsidiaries.  Blom and Willbanks used the Stratford Subsidiaries to incur the liabilities of their operations, and passed the profits from the Stratford Subsidiaries up to Stratford Management and to other Stratford Subsidiaries to keep the assets away from Stratford Subsidiaries' creditors.  The profits from the Stratford Subsidiaries were ultimately paid to Blom and Willbanks.

176.    Blom, Willbanks, and the Stratford Entities commingled funds to benefit themselves and harm creditors.

177.    The Stratford Entities share the same principal place of business.

178.    Using their positions as executive officers and members of the boards of directors for each of the Stratford Entities, Blom and Willbanks made all corporate decisions for each of the Stratford Entities and controlled the day-to-day operations of each of the Stratford Entities.

179.    Using their positions as executive officers and members of the boards of directors for each of the Stratford Entities, Blom and Willbanks caused assets to be transferred between the Stratford Entities, leaving certain of the Stratford Entities, including Stratford Operator, undercapitalized and unable to pay their creditors.  Blom and Willbanks continued to cause these transfers to be made even after Stratford Operator was insolvent.

Case 4:14-cv-00886-FJG   Document 24   Filed 04/29/15   Page 30 of 34

180. While each of the Stratford Entities ostensibly owned its own assets, Blom and Willbanks used the assets of each of the Stratford Entities for the benefit of *all* Stratford Entities and themselves. Specifically, Blom and Willbanks caused loans made from Valley View State Bank to the Stratford Entities to be cross-collateralized, thereby using the assets of one or more Stratford Entities to secure loans made to other Stratford Entities.

181. Blom and Willbanks used each of the Stratford Entities to transfer funds to Stratford Management, who made single monthly payments to Valley View State Bank for each of the loans to the Stratford Entities. Upon information and belief, Blom and Willbanks caused Stratford Operator to transfer more than it owed on any Valley View State Bank loan to Stratford Management, thereby using Stratford Operator to pay for loans made to other Stratford Entities.

182. Blom and Willbanks used their control over each of the Stratford Entities to perpetrate a fraud against the Stratford Operator's creditors, including Plaintiffs.

183. Blom and Willbanks used their control over each of the Stratford Entities to injure Stratford Operator's creditors, including Plaintiffs.

184. Equity requires that Blom, Willbanks, and the Stratford Entities be treated as alter egos of one another.

185. Accordingly, Blom, Willbanks, and the Stratford Entities should be held jointly and severally liable for all damages incurred by Plaintiffs as set forth in Counts I-X, including interest.

<u>**Count XII – Claim for Accounting**</u>
**(Stratford Operator)**

186. Except to the extent inconsistent with the relief requested in this Count, Plaintiffs incorporate by reference the allegations set forth above.

187. Pursuant to the Section 8 of the OTA between Stratford Operator and New Operator, Stratford Operator retained the right to collect all unpaid accounts receivable ("AR") as of the close of business on the day prior to the date operations of the Facility were transferred to New

31

Operator, but only to the extent the AR related to services provided by Stratford Operator on or prior to that date.

188.    Additionally, pursuant to Section 8 of the OTA, New Operator was required to remit to Stratford Operator any payments New Operator received as reimbursement for services provided by Stratford Operator.

189.    At the time Stratford Operator transferred its operations to New Operator, it was both insolvent and winding up its business, and, thus, owed a fiduciary duty to its creditors to hold all of its assets in trust for the benefit of all creditors.  As such, Stratford Operator was required to hold in trust any payment it received on its accounts receivable at the time operations were transferred, and any reimbursements it received from New Operator for services it provided to residents of the Facility.

190.    Upon information and belief, Stratford Operator both received payments on its accounts receivable at the time operations were transferred, and received reimbursement from New Operator on services Stratford Operator provided to residents of the Facility.

191.    Stratford Operator did not distribute to its creditors, including Plaintiffs, any of the payments it received on its accounts receivable at the time operations were transferred or any reimbursements it received from New Operator and, thus, breached its fiduciary duty to its creditors.

192.    Plaintiffs need discovery to determine whether monies to which they are entitled were paid to Stratford Operator, and whether those monies were wrongfully diverted, converted, or transferred by Stratford Operator.

193.    Stratford Operator's accounts are complex and complicated because, among other reasons: (1) money freely passed between Stratford Operator, the other Stratford Entities, Blom and Willbanks, and Stratford Operator's other creditors; (2) through Blom, Willbanks, and John Does 1-

32

10, Stratford Operator undertook great efforts to hide its assets from its creditors; and (3) money was paid to Stratford Operator from multiple sources, deposited in multiple bank accounts, and paid out to multiple people.

194.     Without an accounting, a full, adequate and complete remedy at law will not otherwise be available to Plaintiffs in this action.

195.     Accordingly, Plaintiffs seeks the assistance of this Court in obtaining an independent accounting from Stratford Operator of its accounts receivables from February 1, 2012 to the present.  Said accounting should be at the cost and expense of Stratford Operator.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, RehabCare and PharMerica, request judgment in their favor and against Defendants as follows:

a.     An award of damages in an amount to be proven at trial, including, but not limited to, compensatory, consequential, incidental and special damages, punitive damages, contractual interest, prejudgment and post-judgment interest;

b.     All relief set out in Mo. Rev. Stat. § 428.039.

c.     RehabCare's and PharMerica's costs, expenses and attorneys' fees associated with prosecuting this action;

d.     A full and complete accounting by Stratford Operator of its accounts receivables as of the close of business on the day prior to the date operations of the Facility were transferred to New Operator, as set forth in Section 8 of the OTA; and

e.     Any other relief to which RehabCare and PharMerica may be entitled.

33

Dated:  April 29, 2015                    Respectfully submitted,

                                          /s/ Jennifer Metzger Stinnett
                                          Benjamin C. Fultz, admitted *pro hac vice*
                                          Jennifer Metzger Stinnett, admitted *pro hac vice*
                                          FULTZ MADDOX DICKENS PLC
                                          101 S. Fifth Street, Ste. 2700
                                          Louisville, Kentucky 40202
                                          Phone: (502) 588-2000
                                          Fax: (502) 588-2020
                                          bfultz@fmdlegal.com
                                          jstinnett@fmdlegal.com

                                          -and-

                                          Michelle R. Stewart
                                          David P. Madden
                                          HINKLE LAW FIRM, LLC
                                          800 College Boulevard, Suite 600
                                          Overland Park, Missouri 66211-1533
                                          Phone: (913) 345-9205
                                          Fax: (913) 345-4832
                                          mstewart@hinklaw.com
                                          dmadden@hinklaw.com

                                          *Counsel for Plaintiffs*

34