**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

REHABCARE GROUP EAST, INC. d/b/a   )
REHABCARE GROUP THERAPY   )
SERVICES, INC., and PHARMACY   )
CORPORATION OF AMERICA, AS   )
ASSIGNEE OF PHARMERICA   )
CORPORATION,   )
          Plaintiffs,   )
   )
     v.   )   Case No. 14-0886-CV-W-FJG
   )
STRATFORD HEALTH CARE PROPERTIES, )
LLC, et al.,   )
         Defendants.   )

<u>**ORDER**</u>

Pending before the Court are (1) Defendant Batson's Motion for Summary Judgment (Doc. No. 128); (2) Defendants Stratford Mo/Kan Development Corporation, Stratford Health Care Properties, LLC, Fit for Life, Inc., Fitness for Life, L.C., Stratford Specialty Care, Inc., Kenneth Blom, and Randall Willbanks' Motion for Partial Summary Judgment (Doc. No. 131); and (3) Plaintiffs' Motion for Partial Summary Judgment as to Counts I, IV, VII, VIII, and XI of the First Amended Complaint (Doc. No. 130). All are considered below.

**I.    Background**

Plaintiffs filed their Complaint on October 8, 2014 (Doc. No. 1). On April 29, 2015, the Court granted Plaintiffs' motion for leave to file an amended complaint, and Plaintiffs filed their amended complaint (Doc. No. 24) on that same date. Plaintiffs previously obtained default judgments against Stratford Health Care Group, Inc. ("Stratford Operator"), and in this lawsuit Plaintiffs allege they have suffered damages

due to defendants' scheme to defraud Stratford Health Care Group, Inc.'s creditors. See Doc. No. 24, ¶¶ 64 and 67. Defendants in this matter are (1) Stratford Mo/Kan Development Corporation ("Stratford Management" or "Stratford Development"); (2) Stratford Health Care Properties, LLC ("Stratford Properties" or "Properties); (3) Stratford Health Care Group, Inc. ("Stratford Operator"); (4) Fit for Life, Inc. ("Fit for Life"); (5) Fitness for Life, L.C. ("FFL, L.C." or "Fitness for Life"); (6) Stratford Specialty Care, Inc. ("Seasons Care" or "Specialty Care"); (7) Kenneth Blom ("Blom"); (8) Randall Willbanks ("Willbanks"); (9) Thad Batson ("Batson"); and (10) John Does 1-10. As an initial matter, plaintiffs have not identified the Doe defendants at this stage of the litigation, and therefore the Court will dismiss all claims against John Does 1-10.

Plaintiff's causes of action against Defendants are as follows: Count I—Fraudulent Conveyance against Stratford Properties; Count II—Conspiracy to Engage in Fraudulent Conveyance against Blom, Willbanks, John Does 1-10, and Stratford Properties; Count III—Unjust Enrichment against Stratford Properties; Count IV—Fraudulent Conveyance against Stratford Properties; Count V – Conspiracy to Engage in Fraudulent Conveyance against Stratford Properties, Batson, Blom, Willbanks and John Does 1-10; Count VI—Unjust Enrichment against Stratford Properties; Count VII—Fraudulent Conveyance against Stratford Management; Count VIII—Fraudulent Conveyance against Seasons Care; Count IX—Breach of Fiduciary Duty against Blom and Willbanks; Count X—Aiding and Abetting Breach of Fiduciary Duty against Batson; Count XI—Piercing the Corporate Veil against Blom, Willbanks, Stratford Management, Stratford Properties, Fit for Life, Fitness for Life, and Seasons Care; and Count XII—

Claim for Accounting against Stratford Operator. Plaintiffs' claims in Counts IX and X were previously dismissed on August 31, 2015. See Doc. No. 64.

## II.    Facts

### A. THE PARTIES

Defendant Stratford MO/Kan Development Corporation ("Stratford Development" or "Stratford Management") wholly owns Defendants Stratford Health Care Group, Inc. ("Stratford Operator")[1]; Stratford Health Care Properties, LLC ("Properties" or "Stratford Properties"); Fit For Life, Inc. ("Fit For Life"); Fitness For Life, L.C. ("FFL, L.C." or "Fitness for Life"); and Stratford Specialty Care, Inc. ("Specialty Care" or "Seasons Care") (collectively the "Stratford Entities"). The Stratford Entities plus defendants Ken Blom, and Randy Willbanks are collectively the "Stratford Defendants".  At all times relevant hereto Valley View State Bank had a security interest in various assets owned by Stratford Management and its various subsidiaries.  Defendant Thad Batson served as an attorney to the Stratford Defendants.

Stratford Development is presently owned by Willbanks and was formerly owned by Willbanks, Blom, and non-party Sheila Wade. Willbanks owned about 65% and Blom owned 35%. Blom and Willbanks are the sole members of the company's Board of Directors. Ken Blom was the President of Stratford MO/Kan Development Corporation, Stratford Operator and Specialty Care. Randy Willbanks served as the Secretary of these same three entities. From 2010 through 2012, Blom and Willbanks were the sole members of the Boards of Directors for each of these three entities. These entities also

---

[1] The parties throughout their briefing interchangeably refer to this entity as "Stratford Operator" or "Group."  Although the Court has attempted to refer to this entity as "Stratford Operator" throughout this Order, any reference to "Group" made in this Order refers to "Stratford Operator."

employed Blom. Because he owned Type A shares, Blom technically held voting control over Stratford MO/Kan Development Corporation at the times relevant to this lawsuit. However, Blom and Willbanks made all financing decisions together. Randy Willbanks and Ken Blom have never received any distributions from Stratford Management, and loans Randy Willbanks made to Stratford Management at its founding have never been paid back.

Until 2011, Stratford Operator owned the real estate, tangible property and operations of a nursing home named Hidden Lake Care Center ("Hidden Lake"), located in Raytown, Missouri. In 2011, the real estate and other tangible property of Hidden Lake were conveyed to Stratford Properties, after which Stratford Operator leased the real estate from Stratford Properties and operated Hidden Lake until Hidden Lake was sold in 2012. Specialty Care owned a skilled nursing facility dedicated to residents with Alzheimer's disease called "Seasons Care." While it owned the land and the facility itself, the license to operate that facility was held by Stratford Operator.

The Stratford Entities shared a common controller, Chris Walker. Despite working for multiple entities, Walker's salary was paid by Stratford Development. The Stratford Entities also shared other employees who managed all accounts payable for these entities and who managed the payroll for all the entities. The bookkeepers for Stratford Operator (Hidden Lake) and Specialty Care (Seasons) were tasked with working just on those facilities. Chris Walker was responsible for generating all financial reports for the entities, including providing same to Valley View Bank. Stratford Development and Stratford Operator are S-Corporations, which means that for tax

purposes gains and losses generally flow through the entity and are reported on the individual shareholders' returns.

In 2003, Plaintiff RehabCare Group East, Inc. ("RehabCare") entered into a Therapy Services Agreement with Stratford Operator for RehabCare to provide therapy services to Stratford Operator's residents in exchange for payment from Stratford Operator. In 2008, Plaintiff PharMerica Corporation ("PharMerica") entered into a Pharmacy Services Agreement with Stratford Operator for PharMerica to provide pharmacy services to Stratford Operator's residents in exchange for payment from Stratford Operator. Neither Rehab Care nor PharMerica had any contractual relationship with any of the other parties to this litigation. Plaintiffs assert that in 2009, Stratford Operator was having difficulty paying its vendors, including plaintiffs, on time.

B. HUD REFINANCING OF THE HIDDEN LAKE CARE CENTER IN 2011

In 2010, Ken Blom and Randy Willbanks decided to refinance loans which were secured by the Hidden Lake Care Center through a nursing home program operated by the U.S. Department of Housing & Urban Development ("HUD"). Willbanks and Blom indicate they had previously considered refinancing through HUD and finally decided to apply in 2010 because the interest rate available on HUD loans was better and because Valley View State Bank was demanding that the Stratford entities reduce the amount of their loans held by the bank, essentially foreclosing on any benefits or relief that Stratford Operator could receive from refinancing its mortgage. (Ex. A, Blom Depo., p. 41-42, 82).

HUD required that the real estate on which Hidden Lake Care Center was located be owned by a special purpose, single asset entity. This single purpose, single

asset entity could only own the group of assets related to the nursing home and could have no other debts besides the HUD loan. Stratford Properties was organized by defendant Batson in August 2010, to serve as the special purpose, single asset entity as required by HUD. Stratford Properties would own all the tangible assets of the Hidden Lake Care Center. Blom and Willbanks were the Managers of Stratford Properties. When he prepared and filed the certificate of incorporation for Properties, Batson stated that the company's purpose was "solely to acquire, operate, construct, lease and own a nursing home with assisted living facility and apartments project known as Hidden Lake Care Center located in Raytown, Jackson County, Missouri, and to do any and all things necessary, convenient or incidental to that purpose." See Certificate of Incorporation, Exh. 7. Prior to June 2, 2011, Stratford Development owned independent assisted living apartments, and, as noted above, Stratford Operator owned the real estate for Hidden Lake. Both of those properties were conveyed to Stratford Properties in 2011.

On June 2, 2011, Stratford Development and Stratford Operator executed a general warranty deed, transferring the Hidden Lake Care Center and the independent living apartments to Stratford Properties, LLC for Ten Dollars and other good and valuable consideration. (Ex. A, Blom Depo., p. 85 and Ex. A-1; Ex. C, Batson Depo., p. 62 and Ex. C-1; Ex. E, Blom Aff. ¶ 11).[2] In June, 2011, Stratford Properties completed

---

[2] Plaintiffs attempt to deny this fact, indicating that no one could identify whether the ten dollars was paid, nor could Defendants Blom and Batson identify at their depositions additional consideration received by Stratford Management and Stratford Operator to make this transfer. (Ex. 1, Blom Depo. at p. 86-88; Ex. 3, Batson Depo. at 62). Defendants note, however, that plaintiff ignores the $9.4 million in debt relief received by the two companies in exchange for the HUD loan and more than $600,000 held in

its refinancing and obtained a HUD backed loan from Lancaster Pollard Mortgage Company for $10,369,300. At the closing of the HUD loan, Valley View State Bank received $9.4 million to pay down the loans to Stratford Development and Stratford Operator which were secured by the Hidden Lake Care Center property. The remaining funds were distributed for attorney's fees, loan fees, title and recording fees, and held in escrow for Stratford Operator (and were later distributed to Stratford Operator to be used to pay some of Stratford Operator's creditors). (Ex. A, Blom Depo., 189-190 and Ex. A-2).

Contemporaneous with the HUD re-financing, and as required by HUD, Stratford Operator and Stratford Properties executed a lease agreement whereby Stratford Operator would continue to operate the Hidden Lake Care Center, receiving the income and paying the bills, in exchange for making monthly lease payments to Stratford Properties, who owned the facility pursuant to HUD requirements. Ex. C, Batson Depo., p. 64-69, 88 and Ex. C-2; Ex. E, Blom Aff., ¶¶ 12-14. The parties dispute whether Stratford Operator was slow paying its bills in the months after this transfer, and dispute the value of Stratford Operator's accounts receivable in the 2011-12 time period. However, by June 2011, Stratford Operator owed RehabCare approximately $190,000 for services rendered that went unpaid. See A/R Customer Detail Query, Exh. 15. Stratford Operator was also in arrears to Pharmerica for in excess of $74,000. See Z-Hidden Lake Account Summary, Exh. 16. Further, in its August 31, 2012 Cost Report submitted to the United States Centers for Medicare and Medicaid Services, Stratford

---

escrow for Stratford Operator, which was distributed to Stratford Operator after the close of the Hidden Lake Care Center sale. See Def's SOF ¶¶ 36-37.

Operator reported current assets for year end 2011 of $1,093,399 and current liabilities of $3,814,000. At the same time, Blom and Willbanks had personally guaranteed the $15 million debt to Valley View Bank.

C.  SALE OF NURSING HOME FACILITIES

In late 2011, Ken Blom and Randy Willbanks, as corporate officers of the respective entities which owned the senior care facilities, decided to sell Hidden Lake Care Center, Seasons Care, and another facility named Elliott Place.  Prior to the sales of Seasons Care and Hidden Lake Care Center, Willbanks consulted with his accountant/CPA Michael Dobratz about the tax implications of the sales. To this end, Dobratz prepared a document with calculations regarding taxes which would be owed upon sale of the Seasons and Hidden Lake Care Center.  Defendants state that because of IRS provisions that require the recapture of depreciation when real estate is sold, the potential tax liability upon sale of the Hidden Lake Care Center property was so significant that the tax liability was likely to exceed the proceeds of the Hidden Lake Care Center property sale. (Ex. A, Blom Depo., p. 34, 116-117; Ex. B, Willbanks Depo., p. 65, 111; Ex. E, ¶ 17-18).  Plaintiffs deny this in part, however, arguing that the tax liability referred to as exceeding the proceeds of the sale of the Facility included the taxes that would have to be paid by Blom and Willbanks as shareholders, not just the taxes that would be owed by Properties and Stratford Operator, the sellers of the Facility. (Ex. 4, Stratford Development Cash Flow Recap 2/8/12; DN 133-2, Stratford Development Cash Flow Recap 2/9/12; Ex. 5, Dobratz Depo. at pp. 52-57, 65-66). Further, plaintiffs argue the tax analysis did not take into account any potential effect on taxes of utilizing proceeds of the sale of the Facility to pay Stratford Operator's

creditors, which would have been business expenses of Stratford Operator. (Ex. 5, Dobratz Depo. at p. 28-30).

Given the large potential tax liability, defendants indicated it was recommended that to avoid having to pay taxes on the gains realized from the sale of Hidden Lake Care Center, Stratford Properties would have to acquire property under a 1031 Exchange pursuant to § 1031 of the tax code. (Ex. E, Blom Aff., ¶¶ 17- 18). A 1031 Exchange is a common tax planning device which allows a seller of real estate to defer taxable gains on the sale by using the sale proceeds to invest in new property.[3]

On December 30, 2011, Blom signed a letter of intent with MGM Geriatric Management, LLC ("MGM") for the sale of Hidden Lake and the assisted living apartment for $13.5 million. Stratford Properties sold the assets of the Hidden Lake Care Center to Hidden Lake Realty LLC pursuant to an Asset Purchase Agreement ("APA") dated March 22, 2012. The operations of the Facility were separately conveyed to Hidden Lake Management, LLC via an Operations Transfer Agreement ("OTA") dated August 15, 2012. (DN 133-39, Operations Transfer Agreement). The Operations Transfer Agreement provided that the buyer was not acquiring the liabilities of Stratford Operator. However, Stratford Operator maintained the right to collect on its accounts receivable accrued prior to the OTA. While the APA was dated March 22, 2012, the sale by Properties to Hidden Lake Realty LLC did not close until August 31, 2012. (Ex. 6, Closing Confirmation Signed by Blom). The total sales price was $13.5 million. The

_____

[3] Plaintiffs argue that because a Section 1031 exchange was discussed before the August 31, 2012 closing means that defendants had the intent to defraud plaintiffs long before the sale of the property. Defendants argue that this is an improper inference from the facts.

sales price was allocated as follows: $7.5 million to building, $1.82 million to land, $750,000 to furniture and fixtures, and $3.43 million to goodwill.

Defendants indicate that the goodwill allocation was attributable to the tangible assets of the facility being transferred, so its value was subject to depreciation. (Ex. A. Batson Depo., p. 109-11; Ex. E, Blom Aff., ¶ 23). Further, defendants indicate the manner in which the Hidden Lake Care Center was operated did not generate any tangible, goodwill benefits as part of its sale because no value was generated to Stratford Properties from the manner in which Stratford Operator ran the Hidden Lake Care Center. Additionally, each operator has a different philosophy in the way the care facility is operated, including the operator who took over for Stratford Operator. (Ex. B Blom, Depo. p. 61-64; Ex. E; Blom Aff., ¶ 23). Thus, defendants allocated all the goodwill to defendant Stratford Properties.

Plaintiffs note, however, that Blom prepared a "Seller's Opinion on Goodwill Allocation" acknowledging that goodwill arises from the operations of a nursing home, not the real estate of the nursing home, and that in the case of Hidden Lake, a 25% allocation toward goodwill was justified. In particular, Blom stated, "The name recognition, the reputation within the community, the long-term relationships with the area hospitals and the hospital discharge planners all have created value for the property. The facility has created community relationships, physician and clinical relationships, and established multiple contacts with health care professionals and community leaders through its twenty years of operation. The seller is confident that these recognitions with the community at large will continue to have value and will continue to enhance the census and the rate structures for the project." Blom confirmed

at his deposition that the opinion was prepared for the IRS and he would not say anything in it that was not factually true. (DN 133-19, Seller's Opinion on Goodwill; Ex. 1, Blom Depo. at p. 66- 68). Further, despite that Blom now states in his affidavit that the goodwill was allocated to Properties' tangible assets rather than Operator's operations, in his deposition, Blom stated that the goodwill allocation of the purchase price was made based on tax advice from accountant Michael "Mickey" Dobratz, who was not even aware that the Facility was actually two separate entities, one of which owned only operations and the other of which owned only tangible assets. (Ex. 1, Blom Depo. at pp. 306-308; Ex. 5, Dobratz Depo. at p. 73; see Ex. 3, Batson Depo. at p. 114). In short, the parties dispute whether the goodwill should be considered an asset of Stratford Properties (which received the payment from the sale of the property) or Stratford Operator (which received $0 in exchange for any business operations goodwill).

Plaintiffs argue that Stratford Operator was insolvent on the day of the sale, with a balance sheet showing that its assets were $1,269,718, with liabilities of $3,502,351. However, defendants note that Stratford Operator maintained the right to collect its accounts receivable and further received on the date of closing $605,846 in funds that had been held in escrow from the HUD refinancing to pay creditors. Defendants assert these proceeds were used to pay bills and small vendors, including monies owed to the Federal Government, which took a priority over other sums owed. (Ex. A, Blom Depo., p. 120-121). Defendants state the decision to pay the small vendors and the Federal Government with the escrow sums was made in an attempt to vastly decrease the number of parties to whom Stratford Operator owed money. (Ex. A, Blom Depo., p. 115-

116). Plaintiff, however, indicates that Stratford Operator's bank statements reflect that following the sale, it transferred significant funds to other Stratford Entities. (DN 133-24, Summary Charts; Ex. 1, Blom Depo. at pp. 288-292). While Plaintiffs were not paid with these proceeds, other larger creditors were not paid either.

As part of the sale, the buyer of Hidden Lake Care Center agreed to assume the HUD mortgage of approximately $10.3 million. The sale was not completed until August 31, 2012 because HUD had to approve the buyer's assumption of Stratford Properties' mortgage with HUD.

The August 31, 2012 closing statement reflects net proceeds in the amount of $1,858,866.19. Instead of using this money to pay Stratford Operator's creditors, however, the Defendants had the money deposited with First American Exchange Company, a qualified §1031 intermediary. The net proceeds were then used to purchase other real property on October 14, 2012, which was titled not to Stratford Properties or to Stratford Operator but to several different limited liability companies, many bearing "FAE" (First American Exchange) in their names (the "FAE Entities"). The FAE Entities are wholly owned by Stratford Properties. Defendants deny, however, that if the net sale proceeds had not been used to purchase replacement properties as part of a 1031 Exchange, any proceeds would have been available to pay Stratford Operator's creditors because the tax liability of the Hidden Lake Care Center sale would exceed the net proceeds from the sale. Doc. 132, Def's SOF ¶¶ 43-44.

Between January 2012 and June 2013, Stratford Operator transferred $3,991,620 to Stratford Development. Between January 2012 and November 2013, Stratford Operator endorsed thirty checks to Stratford Development totaling

$1,599,575.71. Between January 2012 and September 2012, Stratford Operator transferred $79,052.80 to Seasons Care. These companies testified that the transfers were made to manage cash flow needs; however, defendants note that these payments were noted on the books of Stratford Operator, Stratford Management, and Seasons Care as accounts payable and receivable, and some of these payments were made to Stratford Management for payments it held over all the Stratford Entities.  Ex. A., Blom Depo., p. 290-91.  Plaintiffs argue that these transfers meant the Stratford Defendants regularly ignored corporate formalities by moving funds among themselves in order to manage cash flow shortages. Defendants dispute this characterization of the funds transfers as the ignoring of "corporate formalities."  Plaintiffs also argue that Willbanks used his other companies to make loans to the Stratford Defendants, without reducing the transfers to some sort of promissory note or writing.

For a period of time following the August 31, 2012 closing, Stratford Operator continued to collect its accounts receivable and pay certain of its accounts payable.

D. UNDERLYING COLLECTION ACTIONS.

On April 16, 2013, RehabCare filed a lawsuit against Stratford Operator because of Stratford Operator's failure to pay RehabCare under the Therapy Services Agreement. Complaint in RehabCare Group East, Inc. v. Stratford Health Care Group, Inc., United States District Court for the Western District of Missouri, Case No. 4:13-CV-373 (DN 1), Exh.25. Stratford Operator did not defend against RehabCare's lawsuit. On August 30, 2013, the United States District Court for the Western District of Missouri entered a default judgment in favor of RehabCare. See RehabCare Default Judgment,

Exh. 26. The judgment entitles RehabCare to $673,398.84 in principal, interest and attorney fees and costs. Id. It also entitles RehabCare to post judgment interest. Id.

On July 12, 2013, PharMerica filed a lawsuit against Stratford Operator because of Stratford Operator's failure to pay PharMerica under the Pharmacy Services Agreement. Complaint in <u>Pharmacy Corporation of America v. Stratford Healthcare Group, Inc.</u>, United States District Court for the Western District of Kentucky, Case No. 3:13-cv-00704 (DN 1), Exh. 27. On November 6, 2013, the United States District Court for the Western District of Kentucky entered a default judgment in favor of PharMerica. <u>See</u> PharMerica Default Judgment, Exh.28. The judgment awarded PharMerica $198,133.86 in principal, interest and attorney fees and costs. It also entitles PharMerica to post-judgment interest. Id.

E. FACTS SPECIFIC TO DEFENDANT THAD BATSON

Thad Batson is an attorney who has been in practice for 32 years. Batson's practice is primarily commercial real estate transactions. Batson indicates he does not do tax law, but he has done hundreds of real estate closing involving Section 1031 exchanges under the Internal Revenue Code. Batson has performed real estate related legal services for Stratford Mo/Kan Development Corporation ("Stratford Development") and its various subsidiaries for many years.

Batson was hired to assist in closing on the HUD loan. Batson indicates he did not know why the loans were being refinanced and did not know about any debts incurred by Stratford Operator other than the Valley View State Bank loans. (Ex. A, Batson Depo., pp. 58-59). Plaintiffs argue that defendant Batson, an experienced

attorney, certainly ought to have known that businesses incur operating expenses.[4] Blom emailed Batson, however, in May 2011 shortly after they had set a finance rate for the loan, that "This [interest] rate makes me feel a little better about the pain of the process. Thanks for your help in all of this. This should help us get through this messy economy." 05/05/11 Email from Blom to Batson, Exh. 26.

HUD required that all the real estate on which Hidden Lake Care Center was located be owned by a special purpose single asset entity ("SPE"). The single purpose entity could own only the group of assets related to the nursing home and could not borrow any other money or own other property. Batson created Stratford Healthcare Properties, LLC ("Stratford Properties") to serve as the SPE. The idea was that Stratford Properties would own all the tangible assets and the name of Hidden Lake Care Center. (Ex. A, Batson Depo., pp. 57-58). Batson also prepared a general warranty deed in which Stratford Operator and Stratford Development deeded the Hidden Lake Care Center to Stratford Properties for Ten Dollars and other good and valuable consideration. (Ex. A, Batson Depo., 62 and Ex 5 thereto; Ex. E, Batson Affidavit ¶ 12). After the HUD refinancing was completed, per the requirements of HUD, Stratford Operator leased the assets owned by Stratford Properties and continued to operate the Hidden Lake Care Center. (Ex. A, Batson Depo., p. 64-66; Ex. E, Batson Affidavit ¶ 13-14).

_____

[4] The Court notes that plaintiffs attempt to dispute Batson's statement of facts 20, 29, 30, 42, 47-52, 67- 68 by incorporating their statement of facts set out in plaintiffs' motion for summary judgment. Given that plaintiffs' motion for summary judgment is aimed solely at the Stratford Defendants and not at defendant Batson at all, the Court agrees with defendant Batson that such incorporation of those facts is improper as to defendant Batson.

Plaintiffs admit that at the time Batson assisted with conveying the assets of Stratford Operator to Stratford Properties, Batson had no knowledge that Stratford Operator was indebted to plaintiffs and planned to continue receiving goods and services from plaintiffs without paying plaintiffs' invoices. (Ex. E, Batson Affidavit ¶ 15). At the time Batson assisted with conveying the assets from Stratford Operator to Stratford Properties, Batson states he had no knowledge whether Stratford Operator was insolvent or whether it would become insolvent as a result of the transaction. (Ex. E, Batson Affidavit ¶ 16). Furthermore, Batson indicates he did not structure the 2011 HUD transaction in a way such that Stratford Operator received no monetary compensation for the transfer. (Ex. E, Batson Affidavit ¶ 18). Although plaintiffs argue that Batson was privy to the loan packages submitted to HUD and those packages included detailed financial information, Batson indicates plaintiffs have presented no evidence that Batson saw or reviewed the financial information of any Stratford entity at the time of the HUD refinancing.

Defendant Batson was also involved in the closings when Blom and Willbanks decided to sell three facilities - Hidden Lake Care Center, Seasons Care and Elliott Place. The parties dispute the reasons why Blom and Willbanks decided to sell the facilities, with Batson indicating that Blom wanted to retire and with plaintiffs indicating that the Stratford Entities were having money problems.  The sale of the Seasons Care facility was the first to close. The closing took place on or about May 1, 2012. During Batson's involvement in the closing of the Seasons Care facility he learned that in October 2010 Rehabcare had obtained a promissory note which was secured by a Deed of Trust lien which encumbered the Seasons Care facility. (Ex. A, Batson Depo.,

p. 90-93; Ex. E Affidavit Batson, ¶ 20-21). Batson was not involved in drafting or reviewing the secured promissory note or Deed of Trust involving Rehabcare. (Ex. E, Batson Affidavit ¶ 22). As part of the Seasons Care closing, Batson made arrangements for Rehabcare to be paid from the sales proceeds and he obtained a release of lien from Rehabcare. (Ex. A, Batson Depo., p. 90-92 and Ex. 13 thereto; Ex. E, Batson Affidavit ¶ 23).

In early 2012, Batson was provided with a copy of a Letter of Intent (LOI) regarding the potential sale of the Hidden Lake Care Center. Although the sales price was allocated as follows: $7.5 million to building, $1.82 million to land, $750,000 to furniture and fixtures, $3.43 million to goodwill, Batson indicates he had no part in deciding or negotiating how to allocate the purchase price. Batson, however, did help draft the contracts. The Operations Transfer Agreement ("OTA") relevant to Stratford Operator provided that the buyer was not acquiring the liabilities of the seller. Although the OTA contains a recital that consideration was being exchanged between Stratford Operator and Hidden Lake Management, LLC, plaintiffs argue that none of the sale proceeds would be paid to Stratford Operator and all were paid instead to Stratford Properties. Batson participated in drafting and negotiating the OTA. Batson also knew that $3.43 million of the $13.5 million purchase price had been allocated to goodwill. Plaintiffs argue that, although Batson claims to not know where that goodwill comes from, Blom wrote a seller's opinion on goodwill which Batson relied upon, which plaintiffs argue means that the goodwill should have been allocated to Stratford Operator, not Stratford Properties. Batson, however, argues that allocation of goodwill is an accounting question and indicated that he would not be prepared to answer that

question for clients, and that instead he was relying on the numbers given to him based on negotiations between the buyer and seller in drafting the APA and the sales price allocation.

Since the liabilities of the seller (except for the HUD mortgage) were not part of the transaction, Batson indicates that he and his clients never discussed any of the selling entities' liabilities except as related to closing costs (brokers, attorney fees, accounting fees). (Ex. E, Affidavit Batson, ¶ 27). According to Batson, Blom and Willbanks never discussed with Batson the finances of Stratford Operator and never told him about any unsecured debts or that they were selling the facilities because they could not pay their bills. (Ex. A, Batson Depo., p. 73, 77-79). Furthermore, Batson indicates he did not review any financial documents of the company such as income statements, balance sheets, accounts payable or accounts receivable because those documents were not pertinent to the services he was rendering. (Ex. A, Batson Depo., p. 68-69, 79, 83-84; Ex. E, Affidavit Batson, ¶ 28). Batson says he had no knowledge of whether at the time of the sale Stratford Operator was insolvent or whether as a result of the sale the Hidden Lake Care Center that Stratford Operator would become insolvent. (Ex. A, Batson Depo., p. 129-130; Ex. E, Batson Affidavit ¶ 31).

In 2012, Batson had no knowledge that Stratford Operator was indebted to plaintiffs for services and goods provided at Hidden Lake Care Center and that Stratford Operator planned to continue to receive goods and services at Hidden Lake Care Center without paying for such goods and services. (Ex. E, Batson Affidavit ¶ 29). Batson indicates he did not intend as a result of the sale transaction that Stratford Operator's assets would be shielded from plaintiffs as creditors. (Ex. E, Batson Affidavit

¶ 32). Although Batson is aware that Stratford Operator received $605,846.08 from HUD in reimbursement for escrow balances at closing, plaintiffs admit Batson does not know how that money was used by Stratford Operator.

Plaintiffs argue that Batson had access to an electronically-maintained due diligence room related to the August 31, 2012 transfer, created using Box.com, and entitled "Hidden Lake Care Center Due Diligence." 07/28/16 Batson Dep., DN 133-22 at 84:18-24. That electronic repository contained the contracts between Plaintiffs and Stratford Operator, and Batson produced from his files a list from that website that included Stratford Operator's contracts with Plaintiffs. See 02/24/2012 Box.com files list, Exh. 30. Plaintiffs indicate that, while Batson disclaimed ever looking at due-diligence financial information, the due diligence request list included requests for financial information, and more particularly it sought information as to all assets and all liabilities. Initial Due Diligence Request List at 1, Exh. 32. Batson, however, indicates that he looked in the Box account only for documents related to the real estate transaction, and denies looking at operational contracts or accounts receivable documents. Batson Depo. pp. 84-85. Batson further notes that plaintiffs offer no evidence that Batson actually saw or reviewed any documents related to accounts payable or liabilities.

Prior to the sales of Seasons Care and Hidden Lake Care Center, Willbanks consulted with his accountant/CPA Michael Dobratz about the tax implications of the sales. Willbanks, Blom, Batson and Dobratz met to discuss the tax implications. Dobratz prepared a document with calculations regarding taxes which would be owed upon sale of the Seasons Care and Hidden Lake facilities. (Ex. D, Dobratz Depo., p. 36-38, 55-57 and Ex. 107 thereto). Because of IRS provisions that require the recapture of

depreciation when real estate is sold, the potential tax liability upon sale of the Hidden Lake Care Center property was significant. (Ex. C, Willbanks Depo., p.65, 111; Ex. B, Blom Depo., p. 34). Dobratz and Blom each testified that the tax liabilities from the sale would likely exceed the net proceeds. (Ex. B, Blom Depo., p. 116-117, 341, Ex. D, Dobratz Depo pp. 56-57). Plaintiffs controvert the assertion that the tax liabilities would exceed the likely net proceeds from the sale; however, plaintiffs do not point to evidence showing that Batson would have known that fact prior to the closing. Batson assisted in the Section 1031 exchange in order to defer taxable gains, placing over $1.8 million in sale proceeds with a qualified intermediary -- First America Exchange Company LLC -- and subsequently said sums were used to purchase other real properties.

Plaintiffs argue that defendant Batson set up the Section 1031 exchanges in order to divert assets from creditors of Stratford Operator, resulting in tax savings to Blom and Willbanks.

With respect to the underlying collection suits filed by plaintiffs, Batson first learned of Stratford Operator's debt with Rehabcare when Randy Willbanks advised him in 2013 that Rehabcare had filed suit against Stratford Operator to collect the debt owed. (Ex. A Depo Batson pp. 171-72). Batson first learned of Stratford Operator's debt with PharMerica as well as PharMerica's collection lawsuit and judgment against Stratford Operation after the instant lawsuit was filed in 2014. (Ex. A Depo Batson p. 173).

## III. Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are

viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co.</u>
<u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–90 (1986). The moving party must carry the
burden of establishing both the absence of a genuine issue of material fact and that
such party is entitled to judgment as a matter of law. <u>Matsushita</u>, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of
evidence" in support of its position. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252
(1986).

> The nonmovant must do more than simply show that there is
> some metaphysical doubt as to the material facts, and must
> come forward with specific facts showing that there is a
> genuine issue for trial. Where the record taken as a whole
> could not lead a rational trier of fact to find for the nonmoving
> party, there is no genuine issue for trial.

<u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations
and quotations omitted).

## IV. Analysis

### A. Defendant Batson's Motion for Summary Judgment (Doc. No. 128)

Defendant Batson moves for summary judgment on the only claim remaining
against him, Count V, for conspiracy to engage in fraudulent conveyances. Defendant
indicates that he is entitled to summary judgment on Count V of the amended complaint
because plaintiffs cannot establish either of the two exceptions to the rule that there can
be no conspiracy between an agent and a principal.

Initially, defendant Batson indicates that plaintiffs have not provided evidence
sufficient to support a claim for civil conspiracy at all. To establish a claim for civil
conspiracy, plaintiff must prove that the defendants had a "meeting of the minds."

Global Control System v. Luebbert, 2016 U.S. Dist. LEXIS 29976, 2016 WL 910190 (W.D. Mo. 2016). To establish a meeting of the minds, plaintiff must establish that each participant acted with "a unity of purpose or a common design and understanding." Id. See also Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co. (In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.), 113 F.3d 1484, 1498 (8th Cir. 1997)(finding that summary judgment is appropriate when the case lacks evidence tending to show an agreement or a "meeting of the minds" and concerted action, summary judgment is appropriate). A conspiracy may be established by circumstantial evidence. National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 50 (Mo. 1966); Am. Builders & Contrs. Supply Co. v. Roofers Mart, Inc., 2012 U.S. Dist. LEXIS 103182, 2012 WL 3027848 (E.D. Mo. 2012).

Here, defendant Batson asserts that, even assuming that the Stratford Defendants were engaged in the transfers of their real estate and other assets in order to make Stratford Operator judgment proof, there is no evidence that Batson knew this was the mission, or knew that Stratford Operator owed debts that it had no intention of paying. Defendant Batson asserts that without such knowledge, he cannot be found to have had a meeting of the minds with his clients to fraudulently transfer the assets.

Additionally, Batson makes the same argument as he did in his motion for judgment on the pleadings: that as an agent of his client, he cannot be liable for conspiracy. The general rule is that an agent cannot conspire with a principal. Wiles v. Capitol Indem. Corp., 75 F. Supp. 2d 1003, 1005-06 (E.D. Mo. 1999). Missouri, however, recognizes two limited exceptions to the general rule of impossibility of conspiracy between a principal and an agent. Macke Laundry Serv. Ltd. P'ship v. Jetz

Serv. Co., 931 S.W.2d 166, 176 (Mo. App. W.D. 1996); Wiles, 75 F. Supp. 2d at 1005-06. Those two exceptions are the "personal stake" exception and the "exceptional circumstances" exception. Id.

First, under the "personal stake" exception, "an agent can be liable for conspiracy with the principal if the agent acts out of a self-interest which goes beyond the agency relationship." Macke, 931 S.W.2d at 176 (internal citations omitted). Second, an attorney may be liable for conspiring with a client in "exceptional circumstances," when he or she "acts beyond his conditional or qualified privilege as an attorney," under the general principles of law governing attorney liability. Wiles, 75 F. Supp. 2d at 1005-06. "The rationale for the privilege […] granted to an attorney representing a client is the attorney's fiduciary duty to the client, and the public policy that attorneys be able to discharge that duty by freely using those procedures that are necessary to competently represent their clients unfettered by fear of personal liability." Macke, 931 S.W.2d at 177 (internal citations omitted). Liability under the exceptional circumstances exception can still be established, when an attorney, not his client, has committed "fraud, collusion or a malicious or intentionally tortious act." Macke, 931 S.W.2d at 177; Wiles, 75 F. Supp. 2d at 1006. This exception "is limited to intentional torts" and does not apply to legal malpractice. Macke, 931 S.W.2d at 177.

When first considering this issue, upon denying defendant's motion for judgment on the pleadings, the Court found that the facts as alleged in the amended complaint could potentially rise to the level of conspiring to commit a tortious act. For instance, the Court found that if Batson knew at the time he assisted in the 2011 HUD refinance and/or in the 2012 sale of the property that Stratford Operator was indebted to plaintiffs

and planned to continue to receive goods and services without paying invoices, Batson could be found liable. See Order, Doc. No. 85. The Court further found that Batson could be found liable if he knew that as a result of these transactions, Stratford Operator would become insolvent. The Court additionally found that if Batson intended as a result of these transfers that the assets of Stratford Operator would be shielded from plaintiffs as creditors and structured those transactions in a way so that Stratford Operator received no monetary compensation for the transfers, he could be held liable. The Court, however, found that these issues would be better addressed on summary judgment, where a record of what Batson knew or intended could be developed.

There is no indication that defendant Batson had a personal stake in this transaction, so the Court finds that exception to the general rule inapplicable. However, the Court finds that questions of material fact remain as to whether plaintiffs can demonstrate "exceptional circumstances" exist which would show that defendant acted "beyond his conditional or qualified privilege as an attorney." Wiles, supra, 75 F. Supp. 2d at 1005-06. The Court finds that defendant Batson's credibility is at issue, and while defendant has testified that he had no knowledge of Stratford Operator's indebtedness, alleged insolvency, or any of Stratford Operator's financial records, the Court finds that plaintiffs have set forth enough circumstantial evidence about what defendant ought to have known for his credibility to be a jury question. As noted by plaintiffs, intent is a question for the trier of fact, making summary judgment inappropriate. For similar reasons, the Court finds that questions of material fact remain as to whether Batson had a "meeting of minds" sufficient to form a conspiracy.

Defendant Batson's Motion for Summary Judgment is therefore **DENIED.**

**B.    Defendants Stratford Mo/Kan Development Corporation, Stratford Health Care Properties, LLC, Fit for Life, Inc., Fitness for Life, L.C., Stratford Specialty Care, Inc., Kenneth Blom, and Randall Willbanks' Motion for Partial Summary Judgment (Doc. No. 131)**

Defendants Stratford Mo/Kan Development Corporation, Stratford Health Care Properties, LLC, Fit for Life, Inc., Fitness for Life, L.C., Stratford Specialty Care, Inc., Kenneth Blom and Randall Willbanks move for summary judgment as to Counts I-VI, and XI as asserted in the Amended Complaint (Doc. 24).  The Court considers each of defendants' arguments, below.

1.    Conspiracy Claims against Ken Blom and Randy Willbanks (Counts II and V)

Plaintiffs bring two counts of civil conspiracy against Blom and Willbanks. In Count II, Plaintiffs allege that Ken Blom and Randy Willbanks conspired with Stratford Properties to engage in a fraudulent conveyance with respect to the HUD refinancing of the Hidden Lake Care Center mortgage. See Doc. 24 ¶¶ 81-88. In Count V, Plaintiffs allege that Ken Blom and Randy Willbanks conspired with Stratford Properties to engage in a fraudulent transfer with respect to the sale of the Hidden Lake Care Center to Hidden Lake Realty, LLC. See Doc. 24 ¶¶ 112-121.   Willbanks and Blom were both agents and officers of Stratford Properties.

Blom and Willbanks note, as did Batson, that the general rule is that an agent cannot conspire with a principal.  Wiles v. Capitol Indem. Corp., 75 F. Supp. 2d 1003, 1005-06 (E.D. Mo. 1999).   There are two exceptions to that general rule.  Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co., 931 S.W.2d 166, 176 (Mo. App. W.D. 1996); Wiles, 75 F. Supp. 2d at 1005-06. Those two exceptions are the "personal stake" exception and the "exceptional circumstances" exception. Id.

Given that the "exceptional circumstances" exception has only been applied as to lawyers in the attorney-client context, Blom and Willbanks argue they cannot be found liable under that exception. Further, Blom and Willbanks argue that there is no evidence that they had a personal stake in the outcome of the transactions that was separate and apart of that of the corporation. With respect to the HUD refinancing, there is no evidence that they received any proceeds from such refinancing, and they argue their role was in the best interest of both Stratford Properties and Stratford Operator in that Stratford Operator received debt relief and Stratford Properties received a lower interest loan. With respect to the sale of the Hidden Lake Care Center, Blom and Willbanks argue that they did not have an independent personal stake because they have never received any personal financial benefit from Stratford Operator, Stratford Properties, or Stratford Management (other than Blom's salary received as a Stratford Operator employee).

In response plaintiffs argue that defendants Blom and Willbanks had an independent personal stake in the alleged conspiracy because the actions taken in this matter demonstrate that, in less than a year and a half, they were able to transfer substantially all of Stratford Operator's assets away from it, leaving Stratford Operator unable to compensate its creditors, and resulting in a separate entity (Stratford Properties) receiving $1.8 million in sales proceeds. Blom and Willbanks then had the proceeds invested in a Section 1031 exchange, without consulting with their accountant about paying Stratford Operator's creditors. According to plaintiffs, the Section 1031 exchange, moreover, had the effect of reducing (or deferring, at the very least) Blom and Willbanks' shareholder taxes (i.e., the personal taxes that would be leveled on them

based on the gain realized after the sale of the real estate). Plaintiffs suggest that leaving the corporation's creditors unpaid so that Blom and Willbanks could realize savings on their personal taxes is a sufficient personal stake so as to apply the personal stake exception to the general rule.

In reply, defendants argue that plaintiffs rely on unwarranted inferences, noting that Blom and Willbanks were not the "ultimate owners" of Stratford Properties (as they were not shareholders in any of the companies other than Stratford Management) nor can plaintiff show they received tax relief at the shareholder level from the 1031 exchange (given that neither were shareholders of Stratford Properties).

The Court finds that questions of material fact remain as to whether Blom and Willbanks received a personal benefit from the Section 1031 exchange, giving them an independent personal stake in the alleged conspiracy. The Court also finds that questions of material fact exist as to whether each of the transactions (the HUD refinancing and that sale of the Hidden Lake facility) were done for legitimate business reasons or in an effort to defraud creditors under MUFTA. Accordingly, the Court **DENIES** defendants' Blom and Willbanks' motion as to Counts II and V of the Amended Complaint.

2.      Claim XI for "Piercing the Corporate Veil"

Claim XI of Plaintiffs' First Amended Petition is for "Piercing the Corporate Veil" and alleges defendants Ken Blom, Randy Willbanks, Stratford Operator, Stratford Management, Stratford Properties, Fit for Life, Fitness for Life and Seasons Care are "alter egos of one another." See Doc. 24 ¶ 173. Plaintiffs allege "Blom, Willbanks and

the Stratford Subsidiaries commingled funds to benefit themselves and harm creditors." See Doc. 24 ¶ 176.

Defendants argue they cannot be liable for the debts of Stratford Operator because: (1) Ken Blom and Randy Willbanks did not use these entities for their own personal gain; (2) Stratford Properties, Fit for Life, Fitness for Life, and Seasons Care had no control over or interest in Stratford Operator; and (3) Stratford Management's position as the owner of Stratford Operator is insufficient to show it controlled Stratford Operator. In order to demonstrate a claim for piercing the corporate veil, plaintiffs must show: "(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will, or existence of its own; and (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory *or other positive legal duty*, or dishonest and *unjust* act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." 66, Inc. v. Crestwood Commons Redevelopment Corp., 998 S.W.2d 32, 40 (Mo. banc 1999) (emphasis in original) (quoting Collet v. Am. Nat'l Stores, Inc., 708 S.W.2d 273, 284 (Mo.App. 1986)).

i.      Blom and Willbanks

Defendants argue there is no evidence Blom and Willbanks used Stratford Operator for their own personal gain. The party attempting to pierce the corporate veil must show an individual has both "complete control and improper purpose" over a corporation. Blanks v. Fluor Corp., 450 S.W.3d 308, 376 (Mo. Ct. App. 2014).

"Shareholders are not ordinarily liable for corporate obligations" absent a showing that the individual used the corporation as "an extension of their own personal mind or will." Id., 450 S.W.3d at 371, 375 (emphasis added). Demonstrating that an individual used the corporate form as an extension of themselves requires "[e]vidence that [an individual] used corporate funds for personal purposes, mixed corporate and personal accounts, or commingled assets so that the ownership interests were indistinguishable." Commonwealth Land Title Ins. Co. v. Miceli, 480 S.W.3d 354, 372, n.10 (Mo.App. E.D. 2015).

Defendants argue that Ken Blom and Randy Willbanks did not treat Stratford Operator's assets as an extension of themselves, and, therefore, the corporate veil may not be pierced against them. First, Ken Blom and Randy Willbanks were not shareholders of Stratford Operator; rather, they were shareholders in Stratford Management. Neither received distributions from Stratford Management; instead, the only money either Blom or Willbanks received from these entities was Ken Blom's paycheck. There is no evidence that Blom and Willbanks co-mingled assets, or comingled corporate and personal accounts. Defendants also argue that there is no evidence that they used to corporate form to effectuate a fraud against plaintiffs.

In response, plaintiffs indicate that there are several signs that should lead to piercing the corporate veil as to Blom and Willbanks: (1) there were common officers and directors of the Stratford Entities; (2) Stratford Development capitalized Stratford Operator and Stratford Operator and Stratford Development then capitalized Stratford Properties; (3) Stratford Operator had grossly inadequate capital; (4) the various Stratford Entities paid each other's expenses and shared employees; (5) Blom and

Willbanks treated the Stratford Entities as a single entity; (6) the other Stratford Entities used Stratford Operator's property as their own, to Stratford Operator's detriment; and (7) Blom and Willbanks acted in their own interests as to the Stratford Entities. Plaintiffs argue that the conveyances made in June 2011 and August 2012 which resulted in Stratford Operator being unable to pay its creditors while Properties' subsidiaries were purchasing $1.8 million in real estate are exactly the sort of wrongs for which alter ego liability is appropriate.

The Court finds questions of material fact remain as to whether piercing the corporate veil should apply to Blom and Willbanks. For instance, there are questions as to whether the Section 1031 exchange was utilized appropriately as a tax planning tool for the corporations, rather than as a means for Blom and Willbanks to defer personal tax liability. There are also significant questions as to whether Blom and Willbanks treated the Stratford Entities as a single entity. Although they may not have co-mingled their own assets with those of the Stratford Entities, there is evidence that they instructed their controller to transfer funds amongst the properties without consideration but instead to manage cash flow issues. In these circumstances, summary judgment is **DENIED.**

> ii. Stratford Properties, Fit for Life, Fitness for Life, and Seasons Care

With respect to these defendants, all (along with Stratford Operator) are wholly-owned subsidiaries of Stratford Management. Defendants indicated that none of these entities had any interest in or control over Stratford Operator. "Ordinarily, a corporation is regarded as a separate legal entity, separate and distinct from its stockholders, officers, and directors, with separate and distinct liabilities and obligations."

Commonwealth Land Tit. Ins. Co. v. Miceli, 480 S.W.3d 354, 370 (Mo. Ct. App. 2015). In particular, defendants argue that Fit for Life, Fitness for Life, and Seasons Care played no role, and are not mentioned in Plaintiffs' Amended Complaint as playing a role, in the allegedly fraudulent transactions. See Doc. 24 ¶¶ 70-80; 98-111. Defendants also argue Stratford Properties was not the alter ego of Stratford Operator even though Stratford Operator leased the Hidden Lake Care Center from Stratford Properties, normal corporate barriers were in place between the two companies.

In response, plaintiffs argue for a broader consideration of the alter ego theory: "[T]he question is whether the corporations are being manipulated through their interrelationship to cause illegality, fraud, or injustice. If they are, the corporate veil will be disregarded to provide relief." Camelot Carpets, Ltd. v. Metro Distributing Co., 607 S.W.2d 746, 750 (Mo. App. 1980) (internal citations omitted). Beyond arguing that Stratford Operator's assets and its business operations were sold, with all of the consideration for those assets and operations being transferred to Stratford Properties, plaintiffs argue that during the 2012-2013 time frame, money was transferred from Stratford Operator to cover expenses of the other companies falling within the umbrella organization. Plaintiffs note that in a March 2012 balance, sheet, Stratford Operator indicated that other Stratford Entities owed it five million dollars, and that transfers to the other Stratford Entities to meet cash flow needs continued even after the sale of the Hidden Lake facility, when Stratford Operator would not be acquiring any new accounts receivable.

Again, the Court finds that plaintiffs have demonstrated that, at the very least, questions of material fact remain as to whether Stratford Properties, Fit for Life, Fitness

for Life, and Seasons Care can be liable under an alter ego theory.  Defendants' motion for summary judgment is **DENIED.**

iii.    Stratford Management

Defendants further argue that Stratford Management exerted insufficient control over Stratford Operator to be found liable under a piercing the corporate veil theory. "Generally, two separate corporations act as distinct legal entities, even if one partly or wholly owns stock in the other." <u>Ritter v. BJC Barnes Jewish Christian Health Sys</u>., 987 S.W.2d 377, 384 (Mo. Ct. App. 1999) (citing <u>Mitchell v. K.C. Stadium Concessions, Inc.</u>, 865 S.W.2d 779, 784 (Mo. Ct. App. 1993)). "In a parent-subsidiary relationship, the parent corporation is ordinarily not liable for tortious acts of the subsidiary corporation," unless the evidence supports a finding which would pierce the corporate veil. <u>See</u> <u>Id.</u> It is presumed that a parent corporation is not liable for the actions of its subsidiaries "without more." <u>See</u> <u>Blanks v. Flour Corp.</u>, 450 S.W.3d 308, 375 (Mo. Ct. App. 2014). Thus, "[t]o hold a parent liable for its subsidiary's acts, 'the control must be actual, participatory and total.'" <u>Ritter</u>, 987 S.W.2d at 385 (quoting <u>Sedalia Mercantile Bank & Trust Co. v. Loges Farms, Inc</u>., 740 S.W.2d 188, 202-203 (Mo. Ct. App. 1987)).

Here, defendants argue that plaintiffs cannot demonstrate sufficient control for Stratford Management to be held liable, nor can plaintiffs demonstrate that the corporate form was used to perpetrate a fraud against plaintiffs, as the allegedly fraudulent conduct was all done for legitimate business purposes.  Plaintiffs again argue that Stratford Management engaged in comingling of funds, and used its property to capitalize other Stratford Entities as its subsidiaries.  Plaintiffs argue that they (and others) remain unpaid creditors while Stratford Operator had been drained of its assets

through, among other things, inappropriate inter-company transfers on money. Again, the Court finds that questions of material fact remain as to whether defendant Stratford Management can be held liable under an alter ego theory, and therefore summary judgment is **DENIED.**

        3.    Claims I and IV for Fraudulent Transfer under MUFTA against Stratford Properties

Under MUFTA, a transfer can be fraudulent in one of two ways. The first way is if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor (the "actual intent method"). Mo. Rev. Stat. § 428.024.1(1). "Fraudulent intent is rarely proven by direct evidence" and instead courts look to "badges of fraud" for that determination. See Taylor v. Clark, 140 S.W.3d 242, 251 (Mo.App. 2004). The eleven badges of fraud under Mo. Rev. Stat. § 428.024.1 are:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property after the transfer; (3) the transfer or obligation was disclosed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was for substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer occurred; (10) the transfer occurred shortly before or after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Although no badge of fraud alone establishes fraud, the presence of several of the badges raises a presumption of fraud. Behr v. Bird Way, Inc., 923 S.W.2d 470, 473 (Mo.App. 1996); see Higgins v. Ferrari, 474 S.W.3d 630, 638 (Mo.App. 2015). Additionally, even if several badges are found, "the transfer is not voidable "against a person who took in good faith and for a reasonably equivalent value." Id.

Second, a fraudulent transfer can be proven through the "constructive fraud method." Specifically, the MUFTA provides that a transfer is fraudulent if the debtor made it without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. Mo. Rev. Stat. § 428.024.1(2).

      i.     HUD Refinancing in 2011

Defendants argue that the HUD refinancing in 2011 was not done with the intent to defraud plaintiffs, noting that Stratford Operator received reasonably equivalent value for the refinancing by having its $9.4 million note to Valley View Bank paid off. Defendants further argue that Stratford Properties was formed because HUD requires the assets to be held by a single entity that has no other debts, and that pursuant to HUD requirements, Stratford Operator continued running the facility, continuing to receive the revenues from its operation of that facility.

Defendants further argue there are no badges of fraud through which intent to defraud may be inferred. The transfer was not to an insider, within the meaning of the term under Mo. Rev. Stat. § 428.009.7(b)[5]; defendants argue that leasing the assets from Stratford Properties did not mean that the debtor retained possession or control of the property after the transfer; debtor had not been threatened with suit before the

---

[5] In the context of a corporation, an insider is one of the following: (1) a director of the debtor; (2) an officer of the debtor; (3) a person in control of the debtor; (4) a partnership in which the debtor is a general partner; (5) a general partner in a partnership; and (6) the relative of a general partner, director, officer, or person in control of the debtor. See Mo. Rev. Stat. § 428.009.7(b).

transfer was made; debtor did not abscond; debtor did not remove or conceal assets, and debtor did not incur substantial debts after the debt was incurred; debtor received debt relief in the amount of $9.4 million payoff of the note, and an additional $600,000 held in an escrow account until August 2012, which is reasonably equivalent in value to the asset transferred; and debtor was not insolvent before or shortly after the transaction because it continued operating the Hidden Lake Care Center after its assets had been transferred. Defendants argue that while the transaction was not disclosed, Stratford Operator was not required to do so. Thus, defendants argue no badges of fraud exist. Additionally, defendants also argue that Stratford Operator received reasonably equivalent value for the exchange, so that the constructive fraud method does not apply. While the term "reasonably equivalent value" is not clearly defined, Mo. Rev. Stat. § 428.019.1 states that "value is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." Defendant notes that Missouri courts have previously held that the sale of a property for 74% of its value was "reasonably equivalent value" for purposes of a fraudulent transfer analysis where the money the property was sold for ($100,000) "permitted the corporation to pay the debts it owed at the time of the conveyance." See First Home Sav. Bank v. C & L Farms, Inc., 974 S.W.2d 621, 628 (Mo. Ct. App. 1998). Here, defendants argue that the approximately $10 million Stratford Operator received from the HUD refinancing was reasonably equivalent value because it was 74% of the fair market value of the Hidden Lake Care Center.

In response, plaintiffs argue that defendants have mischaracterized the evidence on the record. With respect to badges of fraud, plaintiffs argue that defendants meet

several. Plaintiffs note that Stratford Operator was in arrears to both plantiffs on the date of the HUD transfer. Plaintiffs argue that the no reasonable amount of consideration was provided to Stratford Operator for the transfer, arguing that it only received $10 and "other valuable consideration" according to the deed conveying the property. However, the Court finds that this argument misses the point, as Stratford Operator did receive significant benefits in having its mortgage paid in full. The Court, however, also notes that the $9.4 million mortgage amount plus the $600,000 in escrow is not nearly as much as the value the Stratford Properties received less than a year later, $13.5 million. Plaintiffs argue that because debtor remained liable for making lease payments to Stratford Properties, as well as paying taxes, insurance, etc., the debtor retained control of the property after the transfer. The transfer was not disclosed, and it was for substantially all of the debtor's assets (except for accounts receivable). Plaintiffs argue that debtor was insolvent prior to the 2011 transaction, and as of year-end 2010, Stratford Operator's current liabilities ($3.403 million) were more than triple its current assets ($1.022 million). Plaintiffs also argue that transferring to a related corporation is a transfer to an "insider." Sunbelt Envt'l Serv., Inc. v. Rieder's Jiffy Market, Inc., 138 S.W.3d 130, 135 (Mo.App. 2004) (transfer between companies under common ownership was insider transaction). Plaintiffs also argue that subsequent events demonstrate that the transfer was fraudulent, because shortly after the transfer, the Hidden Lake Care Center was listed for sale.

Upon consideration of the parties' arguments, the Court finds that questions of material fact remain for the jury to determine whether the transfer was fraudulent under MUFTA. In particular, the Court is unprepared to find that Stratford Operator received

reasonably equivalent value based on the <u>First Home Sav. Bank</u> case, as it is unclear whether Stratford Operator was able to pay all its debts owed at the time of that conveyance. Defendant's motion for summary judgment is **DENIED.**

ii.    Sale of Hidden Lakes Care Center in 2012

Plaintiffs argue that the sale of Hidden Lakes Care Center in 2012 was fraudulent under MUFTA because no money was allocated to Stratford Operator as a result of that sale. Defendants argue that no money was due to Stratford Operator, and the $3.43 million attributable to goodwill in the property was not Stratford Operator's to sell. Plaintiffs respond that goodwill tends to be an intangible asset related to the operation of a business. In <u>Hanson v. Hanson</u>, the Missouri Supreme Court, reviewing accounting texts and case law, stated, "The common theme in all of these definitions is that the goodwill which can be sold, and is therefore property, attaches not to an individual but to a business entity. Goodwill has no separate existence; it has value only as an incident of a continuing business." 738 S.W.2d 429, 433 (Mo. banc 1987). It further stated, "Irrespective of the setting in which it is found, the meaning of goodwill does not change. It is property which attaches to and is dependent upon an existing business entity." <u>Id.</u> Plaintiffs, therefore, argue that the $3.43 million in goodwill ought to have been allocated to Stratford Operator rather than to Stratford Properties. Plaintiffs also note that many badges of fraud are present as to this claim – all of the purchase price was allocated to Properties, an insider to Stratford Operator, the transfer consisted of the entirety of Stratford Operator's business operations; Stratford Operator received no monetary consideration for the transfer; the transfer left Stratford Operator insolvent, with debts over $3.5 million and assets of less than $1.3 million.

The Court finds that there are questions of material fact preventing summary judgment on this claim.  At the very least, there are significant questions as to whether the goodwill of the business should have been allocated to the property itself (Stratford Properties) or to the business operations (Stratford Operator).  Certainly, the allocation made by defendants has left them open to significant arguments that there are badges of fraud supporting plaintiffs' claims under MUFTA, considering that Stratford Operator was left with only its accounts receivable at the closing, and with very little consideration, if any, paid to it at the time of closing of this sale.  Defendants' motion for summary judgment on this claim is **DENIED.**

4.      Claims III and VI for Unjust Enrichment against Stratford Properties

Defendant Stratford Properties argues that Claims III and VI fail because plaintiffs never conferred a benefit to Stratford Properties.  The essential elements of an unjust enrichment claim under Missouri law are: (1) a benefit conferred by a plaintiff on a defendant; (2) appreciation by the defendant of the benefit; and (3) the acceptance and retention of the benefit under circumstances that would render that retention inequitable. US Bank Nat'l Ass'n v. Cox, 341 S.W.3d 846, 852 (Mo. Ct. App. 2011). When a third party is alleged to have been benefitted by plaintiffs' services, Courts will hold the third party liable when there is some benefit to the third-party's property due to the Plaintiffs' actions. Compare JB Constr., Inc. v. Bierman, 147 S.W.3d 814 (Mo. Ct. App. 2004) (denying unjust enrichment claim where there was no evidence of any benefit to Defendants' "leasehold interest" from Plaintiffs' services); with Green Quarries, Inc. v. Raasch, 676 S.W.2d 261 (Mo. Ct. App. 1984) (allowing unjust

enrichment claim where a building owned by defendant was benefited by plaintiff's financing of renovations, increasing the building's value significantly).

Here, defendants argue that, with respect to Count VI and the sale of the Hidden Lake Care Center, (1) all of plaintiffs' services were provided to Stratford Operator, not Stratford Properties; (2) the nature of the services provided to Stratford Operator did not create anything of value for the Hidden Lake Center's assets, only for its operations; and (3) the goodwill sold as part of the purchase of the Hidden Lake Care Center is attributable only to the Care Center's tangible assets, not to its operations.  As discussed earlier, the Court believes that there are questions of material facts as to the propriety of the allocation of the businesses' goodwill in the sale of the Hidden Lake Care Center.  Furthermore, as noted by plaintiffs, if services such as the kind it provided to Hidden Lake Care Center were not provided, there would be less value to the operations, and possibly the goodwill, to be transferred.  Therefore, defendants' motion for summary judgment as to Count VI is **DENIED.**

With respect to Count III, regarding the HUD Transfer, defendants argue that Stratford Properties did not benefit from that transfer at all because Stratford Properties agreed to be encumbered by debt in the amount of $10,369,300.  Further, although it was receiving rent from Stratford Operator, none of plaintiffs rendered services to Stratford Properties creating any value for it. Additionally, Stratford Operator remained an ongoing business concern, doing the work of operating the nursing home until the end of August 2012. Plaintiffs filed no response with respect to the claim made in Count III.  Therefore, the Court finds that plaintiffs have set forth no genuine issue of material fact as to Count III of the Amended Complaint, and for the reasons stated by

defendants, summary judgment is **GRANTED** in favor of defendants on this unjust enrichment claim.

C. **Plaintiffs' Motion for Partial Summary Judgment as to Counts I, IV, VII, VIII, and XI of the First Amended Complaint (Doc. No. 130)**

Plaintiffs move the Court for a judgment as a matter of law on Counts I, IV VII, VIII and XI of the First Amended Complaint. For the same reasons as stated about with respect to Stratford Defendants' Motion for Partial Summary Judgment, summary judgment will be **DENIED** as to the claims in Counts I, IV, and XI, as issues of material fact remain for trial on those claims. The Court considers Counts VII and VIII, below.

Counts VII and VIII are claims for fraudulent conveyances, brought against Stratford Development (Count VII) and Seasons Care (Count VIII). Beginning in January 2012 and through November 2013, plaintiffs assert that defendant Stratford Operator transferred nearly $4 million to Stratford Development, and additional funds to Seasons Care. Plaintiffs say that the only explanation the companies could provide for these transfers were that they were made to manage the cash flow needs of the other Stratford Entities. Plaintiffs state that Stratford Operator received nothing in return for the money paid to Stratford Development and Seasons care in this time period, and was left without any way to pay its outstanding debts to plaintiff.

In response, defendants indicate the money transfers between Stratford Operator and Stratford Mo/Kan Development Corporation (referred to as "Stratford Management" in the First Amended Complaint) and Stratford Specialty Care, Inc. (referred to as "Seasons Care" in the First Amended Complaint) were not constructively fraudulent because these transfers were done to manage cash flow, were marked on the books as

accounts payable and receivable, and paid certain of Stratford Operator's bills to Stratford Management.

The Court is unable to determine on the evidence before it that the transfers made from Stratford Operator to Stratford Management and Seasons Care were fraudulent. Questions of material fact remain as to whether these transfers were done to pay legitimate business expenses to and from these related entities, or whether the transfers were done in an attempt to defeat corporate formalities and remove assets from Stratford Operator. The Court notes, however, that just because these transfers were noted on defendants' books does not mean, by itself, that reasonably equivalent value was given for those transfers (as argued by defendants). Plaintiffs' motion for summary judgment as to Counts VII and VIII is **DENIED**.

## V.     Conclusion

Accordingly, for the foregoing reasons, (1) Defendant Batson's Motion for Summary Judgment (Doc. No. 128) is **DENIED**; (2) Defendants Stratford Mo/Kan Development Corporation, Stratford Health Care Properties, LLC, Fit for Life, Inc., Fitness for Life, L.C., Stratford Specialty Care, Inc., Kenneth Blom, and Randall Willbanks'  Motion for Partial Summary Judgment (Doc. No. 131) is **GRANTED IN PART** as it relates to Count III of the Amended Complaint, and **DENIED IN PART** in all other relevant aspects; and (3) Plaintiffs' Motion for Partial Summary Judgment as to Counts I, IV, VII, VIII, and XI of the First Amended Complaint (Doc. No. 130) is **DENIED.** The claims against John Doe defendants are also **DISMISSED.**

**IT IS SO ORDERED**.

Date:   September 29, 2017                    **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                         Fernando J. Gaitan, Jr.
                                              United States District Judge